In re Shirley M. SHAW, Debtor.

AMERICA FIRST CREDIT UNION, a
Utah corporation, Plaintiff,

v.

Shirley M. SHAW, Defendant.

Bankruptcy No. 89B–04532.
Adv. No. 89PB–0668.

United States Bankruptcy Court,
D. Utah, N.D.

April 13, 1990.

Timothy W. Blackburn, Van Cott, Bagley, Cornwall & McCarthy, Ogden, Utah, for America First Credit Union.

Daniel L. Wilson, Ogden, Utah, for Shirley M. Shaw.

## MEMORANDUM DECISION AND ORDER

JUDITH A. BOULDEN, Bankruptcy Judge.

This matter comes before the court on the defendant, Shirley M. Shaw's (Debtor), motion for an award of attorney fees pursuant to 11 U.S.C. § 523(d).[1] The plaintiff, America First Credit Union (Credit Union), brought this nondischargeability action pursuant to section 523(a)(2)(B) and then stipulated to dismissal of the claims for relief with prejudice. The parties reserved for trial the debtor's claim for costs and attorney's fees. The court heard the testimony of witnesses and the arguments of counsel and, having made an independent review of the law, the court now enters the following memorandum decision and order.

## FACTS

The Debtor applied for a consolidation loan from the Credit Union in February of 1988. The loan application was not filled out by the debtor, but by Paula Kinney, a loan officer employed by the Credit Union. The application stated that the Debtor had been employed by St. Benedict's Hospital for 15 years and that her monthly take home pay was $950 after taxes and deductions. The Debtor signed the loan application and based thereon was granted a consolidation loan in the amount of $3,574. The Debtor's debt-to-income ratio was .546 prior to the loan and .544 after the loan was made. The loan decreased the Debtor's monthly debt service by $14.

The Debtor's income after deductions for taxes and withholding was, in fact, $950. However, she had arranged with her employer to have a payroll deduction withheld from her paycheck in favor of another creditor in the amount of $110 per month. Thus, her actual take home income, less the $110 payment, was approximately $840. The obligation of $110 per month was fully disclosed as a liability on the credit application.

If the Debtor's total monthly income had been shown as $840 on the credit application, she would probably not have qualified for the loan because her loan-to-income ratio would have been .62. The Credit Union's policies prohibit a loan-to-income ratio which exceeds .60.

The Debtor filed a petition under chapter 7 on July 31, 1989. On the statement of current income filed with the court, the Debtor listed take home income of $862. When the Credit Union received notice of

1. Future references are to Title 11 of the United States Code unless noted.

the filing, Blake Wheathers (Wheathers), the collection manager of the Credit Union, compared the income figures on the loan application to the income figures set forth on the debtor's schedule of current income. Noting the discrepancy between income of $950 shown on the loan application and income of $862 shown on the bankruptcy schedule of current income, Wheathers elected to attend the meeting of creditors held pursuant to section 341. At that meeting, he asked the Debtor if she ever had take home income in excess of $862. She responded under oath that she had not. No further verification of the Debtor's income was attempted. St. Benedicts Hospital, the Debtor's employer, would not verify income over the telephone, though it would in writing. Wheathers' subsequent inquiry of the loan officer indicated that if the Debtor's take home income had been $862, she likely would not have qualified for the loan.

Upon these facts, the Credit Union forwarded the information to its counsel with instructions to initiate a nondischargeability action based upon a false writing. The Credit Union's attorney made no independent investigation into the facts of the case and relied solely upon the information presented to him by his client. Counsel thereafter filed this action.

The Credit Union ultimately learned the truth concerning the Debtor's income sometime after the filing of the complaint and only as a result of the Debtor's attorney's subsequent investigation into the facts of the case. When this information was brought to the attention of the Credit Union, it elected to dismiss its claim for relief with prejudice. Dismissal was stipulated to by the Debtor's attorney, but the issue of the Debtor's demand for attorney's fees were reserved for trial. At trial, the court heard the testimony of the loan officer, Paula Kinney, and the collection manager, Wheathers, in defense of the Debtor's motion for attorney's fees. The Debtor did not testify and a transcript of the section 341 meeting was not available.

## DISCUSSION

### A. Jurisdiction

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and it is a core matter under 28 U.S.C. § 157(b)(2)(I). Venue is proper in the Northern Division of the District of Utah.

### B. Fee Shifting Statutes

■■■ The American Rule, as set forth by the Supreme Court, provides that the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the losing litigant unless the fees are awarded by statute or an underlying contract. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). However, an exception to this general rule has developed in an attempt to give the courts the power to supervise and control proceedings. That exception indicates that reasonable attorney's fees may be awarded against the losing party or against its attorney if the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons". *F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co., Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). This exception provides for fee shifting both to the party and its attorney, and is applicable either in commencing or continuing an action in bad faith. This concept is codified generally in 28 U.S.C. § 1927 [2] which imposes liability on any attorney or other person admitted to conduct cases in any federal court if such person multiplies the proceedings unreasonably and vexatiously.

Rule 11 of the Federal Rules of Civil Procedure also furnishes the court with additional control over pleadings and proceedings. It provides that fees may be

---

**2.** 28 U.S.C. § 1927 states:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

shifted to either the attorney signing the pleadings,[3] the client, or both if pleadings or papers are signed in violation of the rule. Various other fee-shifting statutes have been enacted by Congress to remedy particular wrongs or to regulate specific litigation.[4] Section 523(d) shifts the burden of attorney's fees to the creditor if it commences an action that is not substantially justified. Section 523(d) provides as follows:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d). The purpose of the statute is to protect the honest debtor from actions filed by creditors which have no basis in fact or law and which may be designed to force a beleaguered debtor to pay a debt which should be discharged rather than incur the expense necessary to defend the complaint.[5]

The court should be vigilant in using its special vantage point of viewing multiple nondischargeability actions filed by the same creditor to ensure that no abusive pattern of activity develops of the type circumscribed by the statute. If the court detects such a pattern, section 523(d) provides a means to control the abuse.

### C. Substantial Justification

■ The issue presented in this case focuses on whether the Credit Union's position in filing the nondischargeability action was substantially justified at the time the complaint was filed. The Equal Access to Justice Act (EAJA) 28 U.S.C. § 2412(d)(1)(A) (1982 & Supp.V.1987) was the pattern for section 523(d) and therefore the court looks for guidance to cases interpreting the similar language relative to section 523(d). *Citizens Nat'l Bank v. Randall Clark Burns (In re Burns)*, 894 F.2d 361, 362 n. 2 (10th Cir.1990).[6]

---

**3.** *Pavelic & Leflore v. Marvel Entertainment Group*, —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989) clarifies that Rule 11 sanctions run only to the person signing the pleading, not to a related law firm. The signature on such papers constitutes a certificate that the signer has read the pleading, motion or other paper, that to the best of his knowledge, information, and belief formed after reasonable inquiry, it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose.

**4.** For example, 42 U.S.C. § 1988 provides for fee shifting in certain types of civil rights actions and assesses fees against the losing party, not its attorney. 28 U.S.C. § 2412(d)(1)(A) (1982 & Supp.V.1987), a provision of the Equal Access to Justice Act, allows recovery of attorney's fees against the Secretary of Health and Human Services if the agency's position is not substantially justified.

**5.** Section 523 of the Bankruptcy Code was enacted to discourage creditors from initiating false financial statement exception to discharge actions in the hopes of obtaining a settlement from an honest debtor anxious to save attorney's fees. H.R.Rep. No. 595, 95th Cong., 2d Sess. 365 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.
*Hunting Nat'l Bank v. Russell Hugh Smith (In re Smith)*, 107 B.R. 133, 134 (Bankr.N.D.Ohio 1989).

**6.** The statute mirrors the language of the Equal Access to Justice (EAJA), which states:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, *unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.*

28 U.S.C. § 2412(d)(1)(A) (1982 & Supp. V 1987) (emphasis added).

Contrary to the view expressed by the district court, *see Citizens Nat'l Bank v. Burns (In re Burns)*, 77 B.R. 822, 823 n. 1 (Bankr.D.Colo. 1987), Congress used this language deliberately to indicate its intent that the EAJA standard be incorporated into the fee determination under section 523(d).

The Committee, after due consideration, has concluded that amendment of this provi-

The language found in EAJA was thoroughly analyzed in *Armstead v. United States Dept. of Housing and Urban Development (In re Armstead),* 106 B.R. 405, 414–17 (Bankr.E.D.Pa.1989). The court reviewed the Supreme Court's analysis in *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), and its explanation of the language used in the EAJA. The Supreme Court defined "substantially" as not meaning justified to a high degree, but rather justified in substance or in the main. *Pierce,* 487 U.S. at 566, 108 S.Ct. at 2550. *Armstead* also relied upon the standard adopted in *Brinker v. Guiffrida,* 798 F.2d 661 (3rd Cir.1986) which enumerated three criteria to establish substantial justification: 1) a reasonable basis in law for the theory it propounds; 2) a reasonable basis in truth for the facts alleged; and, 3) a reasonable connection between the facts alleged and the legal theory advanced.

As applied to this case, if the facts discovered by the Credit Union had been as alleged, a reasonable basis existed at law for the complaint. The Credit Union would arguably have been able to prove a debt which arose as a result of its reasonable reliance upon a materially false writing of the Debtor. Therefore, the connection between the facts and the law supported the claim for relief.

The focus then centers on whether there was a reasonable basis in fact upon which the Credit Union was entitled to rely. The Credit Union must show it was justified in bringing this action without more extensive independent analysis which would have shown its assumptions regarding the facts were erroneous.

### D. Reasonable Basis in Truth for the Facts Alleged

■ Guidance regarding the extent of factual investigation required of the Credit Union under section 523(d) can be gained from cases reviewing an attorney's failure to independently verify facts in the context of a Rule 11 violation. Rule 11 requires the signer to have read the paper and, after reasonable inquiry, believe it to be well grounded in fact. Rule 11 and section 523(d) have similar language and a similar purpose relative to the necessity for factual investigation on the part of the signor or plaintiff.

Several circuits have developed criteria relating to Rule 11 factual inquiry which, when construed collectively and placed in a section 523(d) context, are informative.[7] Collectively, these cases set forth the following criteria. 1) Was there time available to the plaintiff for investigation? 2) To what extent did the attorney rely on the client for factual support? 3) How feasible was prefiling investigation? 4) How complex were the factual and legal issues? 5) To what extent do the development of the factual circumstances require discovery? 6) Is there a potential pattern of attorney or creditor conduct? 7) Was the information esoteric or pivotal? 8) Was the factual information largely in the control of the debtor? 9) Would a reasonable creditor file such a complaint? 10) Is the contrary evidence so overwhelming a reasonable creditor could not have concluded that the minimal supporting evidence constituted the substantial evidence needed?

■ A comparison of the factual investigation performed in this case to these common standards indicates the following. 1) The Credit Union was not under undue time constraints. The deadline for filing

---

sion to incorporate the standard for award of attorney's fees contained in the Equal Access to Justice Act strikes the appropriate balance between protecting the debtor from unreasonable challenges to dischargeability of debts and not deterring creditors from making challenges when it is reasonable to do so. This standard provides that the court shall award attorney's fees to a prevailing debtor where the court finds that the creditor was not substantially justified in challenging the dis-

chargeability of the debt, unless special circumstances would make such an award unjust.
S.Rep. No. 65, 98th Cong., 1st Sess. 9–10 (1983).
*Burns,* 894 F.2d at 362 n. 2.

7. *Thomas v. Capital Sec. Serv., Inc.,* 836 F.2d 866 (5th Cir.1988); *St. Amant v. Bernard,* 859 F.2d 379 (5th Cir.1988); *Adamson v. Bowen,* 855 F.2d 668 (10th Cir.1988).

complaints was November 13, 1989, and the complaint was filed October 24, 1989; thus, approximately 20 days remained to investigate the facts. 2) The Credit Union's attorney relied exclusively upon his client's factual investigation and made no independent inquiry.[8] 3) It was feasible to obtain third-party verification of the Debtor's income, although the verification would have required some minimal correspondence to St. Benedict's Hospital. 4) The amount of the Debtor's after-tax income was an issue of simple fact that was pivotal to the case. 5) Verification of the facts did not require formal discovery though, as with all bankruptcy cases, additional discovery was available in the form of a Rule 2004 examination. 6) The Credit Union's common methodology in cases of this nature is of concern because it requires no outside verification of facts or investigation other than a cursory comparison of the loan documents to the debtor's schedules. No attempt was made to investigate or establish intent. The Credit Union depended instead upon meeting the other criteria set forth in section 523(a)(2)(B). 7) The income data which was not independently verified was pivotal to the case. 8) The income information was not exclusively in the control of the Debtor. 9) A reasonable creditor would probably have evaluated the amount to be recovered of $2,338.16, in relation to the costs of investigation. The amount may argue against extensive discovery. The independent verification of the Debtor's income, however, would have been relatively inexpensive. 10) The contrary evidence available to the Credit Union was the income figure written by it on the loan application but confirmed by the debtor. Some question should naturally have arisen as to whether the Credit Union's income

verification procedures at the inception of the loan were faulty. If accurate, that information would have argued against filing the action without further investigation. Apparently, the Credit Union does not rely heavily upon any verification it may do at the initiation of the loan.

■ Application of the above criteria requires an objective not a subjective analysis. It is based on a reasonable creditor's inquiry. Whether such cursory investigation into the facts of the case is prudent, whether it is worthy of adoption by the Credit Union as a standard operating procedure, or whether such a loan should ever have been made in the first place is not this court's concern. The role of the court is to determine if a creditor would have believed there were facts which substantially justified the filing.

Based upon all the information and application of the above criteria, it is clear to the court that a reasonable creditor would have made further inquiry and would, with little cost or inconvenience, have discovered facts which were not supportive of its case. Having uncovered such facts, they would not have supported the Credit Union's legal position; thus, the nexus between law and fact would have been missing. The creditor's position would not have been substantially justified.

### E. Special Circumstances

■ The Credit Union chose not to inquire of the source which would have carried the most compelling evidentiary weight, the Debtor's employer. Instead, it chose to question the Debtor at the meeting of creditors to establish the remaining fact necessary for its case. The court has

---

8. Rule 9011 requires that the person signing the pleadings do so only after reasonable inquiry that the pleading is well grounded in fact. "An attorney must ascertain the facts and review the law to determine whether the facts fit within a recognized entitlement to relief." *In re TCI, Ltd.,* 769 F.2d 441, 446 (7th Cir.1985). *See also Styler v. Tall Oaks, Inc. (In re Hatch),* 93 B.R. 263, 267 (Bankr.D. Utah 1988), *rev'd* 114 B.R. 747 (D.Utah 1989).

The court makes no determination as to whether the Credit Union's attorneys' failure to

independently investigate the facts constituted a Rule 9011 violation. Such a determination requires notice and a hearing. "The bankruptcy court erred in imposing sanctions under Bankruptcy Rule 9011 without notice and hearing in violation of the rights of the trustee and her counsel to due process of law under the Fifth Amendment to the constitution of the United States." *Styler v. Tall Oaks, Inc. (In re Hatch),* at 748.

no way of knowing how or what was asked of the Debtor by Wheathers at the meeting of creditors. Nor is the court able to evaluate the Debtor's credibility at that moment because no transcript of that proceeding was made available to the court. Questions presented at a meeting of creditors may stimulate the truth or may be of such a cursory nature as to produce unreliable answers.

However, it is reasonable that the Credit Union should be able to rely upon the information gained from the Debtor in her own schedules and testified to under oath at the meeting of creditors. The court would be hard-pressed to say that a debtor's statement under oath at a meeting of creditors was not of sufficient reliability to serve as one of the factual elements necessary to support a complaint. The Debtor's sworn testimony regarding a pivotal material fact must be considered by the court to have sufficient probative value when viewed in context by the creditor to provide the facts necessary to support the complaint.

Absent contrary evidence of what occurred at the section 341 meeting or some explanation of the Debtor's prior inconsistent testimony, the court concludes that to award costs and fees against the Credit Union would be unjust. The Credit Union's reliance on the Debtor's sworn testimony represents special circumstances such as to relieve the Credit Union from the imposition of the punitive provisions of section 523(d).

## CONCLUSION

Filing a nondischargeability action sounding in fraud should never be a routine matter. It requires competent factual and legal analysis by both the plaintiff and its counsel. It should not be undertaken without consideration of the consequences to the debtor, to the creditor, or to the attorney signing the pleadings. To use such a filing to "shakedown" an honest debtor who is unable to fund a defense is reprehensible. Conversely, a creditor must be able to rely not only on the debtor's sworn schedules, but upon a debtor's sworn testimony. Therefore, it is hereby

ORDERED, that the motion for attorney's fees is denied.