James **BLACKTHORNE**, Plaintiff,

v.

Ellis **POSNER**, et al., Defendants.

Civ. No. 94–277–JO.

United States District Court,
D. Oregon.

March 28, 1995.

Peter C. Richter, Merrill Max Williams II, Miller Nash Wiener Hager & Carlsen, Portland, OR, for plaintiff.

Susan M. Hammer, Paul C. Buchanan, Stoel Rives Boley Jones & Grey, Scott G. Seidman, Jon P. Stride, Zachary W.L. Wright, Tonkon Torp Galen Marmaduke & Booth, Portland, OR, for defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

This case involves the collapse of an employment relationship between Plaintiff and Defendants,[1] from which Plaintiff asserts twelve separate state law claims against Defendants. This matter is before the Court on Defendants' Motion for Summary Judgment (# 41–1).

## FACTUAL BACKGROUND

Prior to the fall of 1991, Plaintiff was employed at Compucom Systems ("Compucom"), a competitor of Computerland. However, between August 1991 and October 1991, Plaintiff discussed with Mr. Posner, Computerland's area director for the Northwest, the possibility of employment at Computerland. Mr. Posner allegedly told Plaintiff that he would be the branch manager for the Portland office if he chose to work for Computerland. Mr. Posner also allegedly informed Plaintiff that he would have target annual earnings (TAE) around $90,000–$100,000,

and would receive a sign-on bonus of $5000–$10,000. Sometime during these conversations (the specific time is disputed), Plaintiff became aware that the corporate headquarters had "some role" with regard to any offer of employment. Wright Aff. Ex. A, Blackthorne Dep. at 189–90.

In late November 1991, Plaintiff received by mail a written offer of employment with Computerland, dated November 20, 1991. The terms of that offer are the following:

(1) the TAE would be $72,000;

(2) the bonus would be $3,000; and

(3) plaintiff would be an "at will employee."

Plaintiff read the offer and understood the three terms of employment listed above. At some time before or after the offer letter (the exact date is disputed), Plaintiff gave notice to Compucom that he intended to work for Computerland.

Plaintiff started working at Computerland before he officially accepted the offer. Plaintiff alleges that during this time, Mr. Posner told him that he would receive the amount originally represented (i.e. $90,000–$100,000) as soon as Plaintiff became "branch sales manager" of the Portland downtown branch in January 1992. Thereafter, Plaintiff accepted the written offer by signing either the actual letter or a faxed copy (which document was signed is disputed), on December 4, 1991.

In late January 1992, Mr. Posner assigned Plaintiff to the position of "branch sales manager" for downtown Portland, but Plaintiff's salary remained the same. Prior to Plaintiff's appointment, Mr. Posner told one of his subordinates, Prakash Joshi, that Computerland intended to close the downtown branch.

During January and February, Plaintiff claims that he questioned Mr. Posner several times about his compensation. Mr. Posner allegedly told Plaintiff that corporate headquarters erred and "he would take care of it." Blackthorne Aff. ¶ 8. However, Plaintiff's TAE remained the same as stated in

1. Defendants refer to Vanstar Corporation (also known as Computerland), Ellis Posner, and Jay Amato.

the November 1991 written offer of employment.

In March 1991, Mr. Posner allegedly explained to Plaintiff that he would be elevated to a "major account manager" at the Boones Ferry branch and be given "the best accounts."[2] *Id.* ¶ 9. As promised, Mr. Posner transferred Plaintiff to the Boones Ferry branch on April 1, 1992, to be a "major account manager," but Plaintiff's TAE remained unchanged.

As a "major account manager," Plaintiff was assigned the prospective Payless Drug account. Though he worked on it for four months, Plaintiff failed to complete the sale. Consequently, he lost the commission for the account. During this period, Mr. Joshi worked as a "branch sales manager." He testifies that Mr. Posner instructed him "to give Mr. Blackthorne no accounts or nonproducing accounts so that Mr. Blackthorne would fail at his position." Joshi Aff. ¶ 9.

After losing the Payless Drug account, Mr. Posner allegedly asked Plaintiff to join him in Los Angeles ("L.A."), California to open a new Computerland branch. Plaintiff states that Mr. Posner orally promised the following conditions of employment in L.A.:[3]

(1) the project would take only three months;

(2) Plaintiff would receive a $20,000 bonus;

(3) business expenses would be paid in advance;

(4) Plaintiff would receive monthly bonus payments for June, July, and August 1992; and,

(5) when Plaintiff returned to Portland, he would be a "branch manager" with a TAE of $80,000.[4]

These oral representations were never reduced to writing.[5] Nevertheless, Plaintiff agreed to work in L.A.

Unfortunately, Mr. Posner did not fulfill his oral promises:

(1) the L.A. project lasted six months through December 1992,

(2) Plaintiff never received the $20,000 bonus,

(3) expenses were not paid in advance but rather reimbursed weekly,

(4) the monthly bonus of $1,800/month was not paid in June; instead, $3,600 was paid in July and the remaining $1,800 in August; and,

(5) Plaintiff's TAE was never raised to $80,000.

With regard to the $20,000 bonus, Mr. Amato, president of Computerland, explains that it was a significant departure from the Compensation Plan, and would have required his written approval. Mr. Amato also stated that when he asked Mr. Posner about the $20,000 bonus, Mr. Posner denied making such a promise.

In addition to the alleged unfulfilled promises, Plaintiff contends that throughout the course of his employment at Computerland, he witnessed and was subjected to vulgar and abusive language by Mr. Posner.[6] Al-

---

**2.** Plaintiff states that Mr. Posner promised to assign accounts to him. Though Defendants argue to the contrary, Mr. Posner's testimony does not contradict Plaintiff's statement, but rather suggests that Mr. Posner believed Plaintiff intended to solicit major accounts. Therefore, the evidence indicates that Plaintiff was to receive some accounts and obtain other accounts himself.

**3.** Except for the promise to pay a $20,000 bonus, Defendants do not dispute Plaintiff's allegations regarding Mr. Posner's oral promises.

**4.** During the L.A. project, Mr. Posner told Plaintiff that he would receive an increased TAE of $80,000 when he returned to Portland.

**5.** The written Compensation Plan reads in part: "there will be no variations or modifications to

the plan, except by way of written agreement." Amato Aff. Ex. 1 at 15. Plaintiff asserts that a Compensation Plan was never given to him. Though Defendants do not dispute Mr. Posner's representations, they state that the quoted clause from the handbook operates to allow only written terms of employment.

**6.** Plaintiff and Mr. Joshi allege that Mr. Posner often directed the following intimidating and abusive language towards his subordinates: "miserable sack of shit," "I'll rip out your fucking heart," "ruin you emotionally and financially," "ruin your family," make you "suck dick." Blackthorne Aff. ¶ 21; Friendler Aff. ¶ 18. Mr. Posner allegedly described his aggressive management tactics as "mind fucking." Blackthorne Aff. ¶ 24.

though Plaintiff admits to also using profane language in the workplace, he maintains that, unlike Mr. Posner, he did not use such words to intimidate, humiliate, or threaten others. Furthermore, Plaintiff states that Mr. Posner told him that Mr. Amato approved of Mr. Posner's use of verbally abusive tactics on employees.

Mr. Joshi recounts one incident during the L.A. project when Mr. Posner placed a telephone conversation with Plaintiff over the speakerphone so that other employees could hear it: "Mr. Posner verbally abused [Plaintiff] and threatened him with termination." Joshi Aff. ¶ 6. After the conversation, Mr. Posner allegedly told Mr. Joshi that Plaintiff was having financial difficulties in L.A. because he was spending all his money on hookers.

Plaintiff never confronted Mr. Posner or Mr. Amato about the language because Mr. Posner was Plaintiff's superior and Mr. Amato was Posner's friend. However, three other employees complained about Mr. Posner's behavior.

As a result of the abuse and broken promises, Plaintiff allegedly became physically and mentally ill. After Plaintiff went on disability leave, he filed a workers' compensation stress claim in March 1993. Thereafter, Plaintiff was terminated on June 1, 1993. In response, Plaintiff filed this action on March 16, 1994 asserting twelve claims for relief. On February 1, 1995, Defendants filed this Motion for Summary Judgment against Plaintiff's Complaint. After considering the arguments submitted and the applicable law, Defendants' Motion for Summary Judgment (# 41–1) is GRANTED IN PART AND DENIED IN PART.

## STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91

L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *Id.* at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

## DISCUSSION

### I. Personal Jurisdiction of Mr. Amato

Before addressing Defendants' Motion for Summary Judgment against Plaintiff's Complaint, I will resolve this Court's personal jurisdiction over Mr. Amato, who was the Senior Vice President of Major Marketing Operations for Computerland during most of Plaintiff's employment with Computerland.

"Jurisdiction over an individual director or officer of a corporation may not be predicated on the court's jurisdiction over the corporation itself, unless the individual maintains contacts with the forum state that would subject him to the coverage of the state's long-arm statute and comport with due process." *Hoag v. Sweetwater Intern.,* 857 F.Supp. 1420, 1426 (D.Nev.1994) (court dismissed claim against officer of corporation because he did not have minimum contacts with the forum state) (citing *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984)). Plaintiff does not allege that Mr. Amato was personally involved in any of the matters involving his claims against Computerland and Mr. Posner. Furthermore, Mr. Amato is a resident of California with minimal physical contacts with Oregon. For these reasons, I find that Mr. Amato does not have sufficient contacts with

**1450**

Oregon to allow this Court to assert personal jurisdiction over him. Accordingly, Mr. Amato is DISMISSED as a Defendant in this suit.

With regard to Plaintiff's twelve claims against Computerland and Mr. Posner, Defendants offer multiple arguments in an effort to dismiss every claim. I address the arguments as they appear in Defendants' Memorandum in Support of Summary Judgment.

## II. Third Claim for Breach of Contract

In his third claim for relief, Plaintiff alleges that Defendants breached an employment contract by

(1) failing to provide compensation between $90,000–$100,000,

(2) failing to pay the $20,000 bonus,

(3) failing to raise his earnings from $72,000 to $80,000 in January 1993,

(4) failing to promptly pay his monthly bonus for the L.A. project, and

(5) failing to provide timely reimbursements for L.A. business expenses.

Am. Compl. ¶ 73. I will discuss Defendants' arguments regarding each alleged breach in turn.

### A. $90,000–$100,000 TAE

■ Defendants argue that the alleged promise to pay a $90,000–$100,000 TAE is barred by the parol evidence rule, ORS 41.740.[7] Defendants explain that the offer letter signed by Plaintiff, which expressly stated that Plaintiff's TAE was $72,000, was a completely integrated agreement. Therefore, Plaintiff is barred by the parol evidence rule from introducing evidence of prior

agreements to supplement or contradict the written agreement.

■ Defendant correctly argues that the parol evidence rule bars evidence of prior written or oral agreements offered to supplement or contradict a completely integrated agreement. *Abercrombie v. Hayden Corp.*, 320 Or. 279, 288, 883 P.2d 845 (1994). However, whether an agreement is completely integrated is a question of fact for the court that is answered by the objective intent of the parties. *Id.* at 287–88, 883 P.2d 845. That is, whether "a reasonable person in the circumstances would have understood the writing or groups of writings to be a complete and exclusive expression of all the terms of their agreement." *Wescold, Inc. v. Logan International, Ltd.*, 120 Or.App. 512, 520, 852 P.2d 960 (1993) (citing *Hatley v. Stafford*, 284 Or. 523, 535–36, 588 P.2d 603 (1978)), *rev. den.*, 318 Or. 459, 871 P.2d 123 (1994). Because Plaintiff read and signed the written offer which expressly stated that his TAE would be $72,000 instead of $90,000–$100,000, Plaintiff carries a heavy burden to show that the agreement is not integrated at least to that term of employment. Nevertheless, the issue of integration and the admissibility of promises prior to the written contract will be decided in a Federal Rules of Evidence 104 hearing prior to trial.[8]

■ With regard to promises made after the written agreement, the parol evidence rule does not bar evidence of agreements or conduct subsequent to the written contract. *Allen v. Allen*, 275 Or. 471, 479, 551 P.2d 459 (1976). Therefore, the parol evidence rule does not prohibit evidence of Mr. Posner's repeated assurances that Plaintiff would receive the higher TAE, which were made *after* Plaintiff signed the offer letter.[9]

7. ORS 41.740 provides: "[w]hen the terms of an agreement are reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is in fact in dispute."

8. Rule 104 states in part: "[p]reliminary questions concerning * * * the admissibility of evidence shall be determined by the court * * * * In making its determination it is not bound by the rules of evidence except those with respect to privileges."

9. Similarly, Plaintiff may submit evidence regarding pre-contract promises for the purposes of proving fraud or illegality because ORS 41.740 provides that the parol evidence rule does not apply "where the validity of the agreement is the

## B. $20,000 Bonus and TAE Increase to $80,000

■ Defendants contend that the alleged promises to pay the $20,000 bonus and raise Plaintiff's compensation to $80,000 are barred by the "no oral modification clause" of Plaintiff's Compensation Plans. The clause states, "there will be no variations or modifications to the plan except by way of written agreement." Amato Aff. Ex. 1 at 15.

In support of their argument, Defendants cite cases in which the signed agreement contained an express term which contradicted subsequent oral agreements. The present action is not analogous; Defendants admit that the "no oral modification clause" is not a term of the written agreement signed by Plaintiff, but rather is a provision in the Compensation Plan applicable to Plaintiff's position. Furthermore, Plaintiff denies receiving a copy of the Compensation Plan and Defendants submit no evidence suggesting that Plaintiff was ever given a copy of the Plan. Accordingly, the Compensation Plan cannot operate to bar Plaintiff's claims for the alleged breach of promises relating to a $20,000 bonus or a TAE raise which were made by his superior, Mr. Posner.[10]

## C. Monthly Bonus Payments

■ Though Mr. Posner promised Plaintiff that he would receive monthly bonus payments for June, July, and August, Plaintiff did not receive the June payment until July. Defendants argue that because Plaintiff eventually received the monthly bonus payments, there was no breach.

Plaintiff has not specifically claimed an amount of damages for this alleged breach. In the absence of an allegation of substantial

damages, I apply the doctrine of de minimus non curat lex (the law does not concern itself with trifles). Accordingly, Defendants' Motion for Summary Judgment on this claim is GRANTED, and Plaintiff's claim for breach of the promise to pay monthly bonuses in June, July, and August is DISMISSED.

## D. Business Expenses

■ Like the monthly bonus payments, Defendants argue that Plaintiff eventually was reimbursed, though not in advance, for all business expenses. Therefore, Defendants did not breach any oral contract to pay such expenses.

As stated above, Plaintiff has not specifically claimed an amount of damages for this alleged breach. In the absence of an allegation of substantial damages, I apply the doctrine of de minimus non curat lex. Accordingly, Defendants' Motion for Summary Judgment on this claim is GRANTED, and Plaintiff's claim for breach of the promise to pre-pay business expenses is DISMISSED.

In accordance with the foregoing discussion, Defendants' Motion for Summary Judgment on Plaintiff's Third Claim is GRANTED IN PART AND DENIED IN PART. Furthermore, a Rule 104 hearing will be held to determine the admissibility of promises made prior to the written agreement.

## III. Sixth Claim for Breach of Duty of Good Faith and Fair Dealing; Eleventh Claim for Wages Owed

Plaintiff asserts in his sixth claim for relief that Defendants breached their implied duty of good faith and fair dealing because they did not attempt in good faith to fulfill their

---

fact in dispute * * * or * * * to establish illegality or fraud." Furthermore, if the written agreement is found invalid, then the writing may not bar evidence of oral agreements.

However, Plaintiff is warned that the validity of these oral contracts is uncertain in light of Plaintiff's pre-existing legal duty to work for Computerland and ORS 41.580(a) which voids an unwritten agreement "that by its terms is not to be performed within a year from the making."

**10.** Defendants also rely on the theory that Plaintiff knew at all times that changes in his compensation were subject to corporate approval, thus

he could not reasonably expect the bonus or the raise. The testimony cited by Defendants shows that Plaintiff knew that corporate headquarters was involved in the approval of offers and terms of employment. However, this testimony does negate the potentially reasonable belief that Mr. Posner possessed sufficient influence to effectuate the fulfillment of the promises he allegedly made to Plaintiff. Furthermore, Plaintiff states, "I always believed that Mr. Posner, as my superior, had the authority to make the representations and promises that he made to me on behalf of Computerland." Blackthorne Aff. ¶ 19. The reasonableness of Plaintiff's belief is a question for the jury to determine.

obligations under the written employment contract. Am.Compl. ¶ 86–87. Additionally, in his eleventh claim for relief, Plaintiff seeks wages owed pursuant to promises made, the employment agreement, and Oregon Revised Statutes (ORS) § 652.140 (1993).[11] Am. Compl. ¶ 104–105.

Defendants argue that Plaintiff's sixth and eleventh claims for relief should be dismissed because they are based on promises discussed above which Defendants conclude are unenforceable.

 As to Plaintiff's sixth claim regarding the implied duty of good faith and fair dealing, I hold that this is not a separate claim for breach of contract but rather is merely an instruction for the jury. Accordingly, Plaintiff's sixth claim is STRICKEN and will be included among the jury instructions.

With regard to Plaintiff's eleventh claim for wages owed, I held earlier that (1) the parol evidence rule does not bar evidence of promises subsequent to the written contract, and (2) the "no oral modification clause" will not prohibit evidence of oral promises. Consequently, I refuse to dismiss Plaintiff's eleventh claim which is premised on those promises. Therefore, Defendants' Motion for Summary Judgment on Plaintiffs' Eleventh Claim is DENIED.

## IV. Twelfth Claim for Workers' Compensation Discrimination

 Plaintiff alleges that "Defendant Computerland used discriminatory practices against plaintiff, in failing to pay the compensation owed him for his work, as a result of filing a workers' compensation claim." Am. Compl. ¶ 106 (citing ORS 659.410).[12] Defendant urges the Court to dismiss this claim because Plaintiff has produced no evidence to counter Defendants' motion and to support the allegation of intentional discrimination.

 The primary purpose of a motion for summary judgment is to "isolate and dispose of factually unsupported claims." *Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmoving party cannot rely on the "mere pleadings themselves" to oppose summary judgment. *Id.* at 324, 106 S.Ct. at 2553. I find no evidence of intentional discrimination against Plaintiff as a result of filing a workers' compensation claim. Instead, the facts demonstrate that Defendants never intended to pay the bonus and wages requested by Plaintiff at any time. Therefore, based on the record before me, I conclude that no jury could reasonably find that Defendants refused to pay compensation because Plaintiff filed a workers' compensation claim. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Twelfth Claim is GRANTED, and Plaintiff's Twelfth Claim is DISMISSED.

## V. Fifth Claim for Breach of the Employment Contract

In his fifth claim for relief, Plaintiff alleges that Defendants breached the express terms and conditions of the employee handbook. Defendant seeks to dismiss this claim because the August 1992 edition of the Employee Handbook contains an express disclaimer:

> [t]his handbook is not a legal document, nor is it intended to create any contractual obligations, nor to serve as an employment contract or promise or guarantee of employment in any specific job or for any length of time or any specific terms or conditions of employment.

Wright Aff. Ex. E. at 1. Plaintiff argues that summary judgment is inappropriate because Plaintiff started working for Defendants in December 1991, but the handbook referenced by Defendants is dated August 1992. Therefore, Plaintiff concludes that the handbook disclaimer does not apply to the alleged breaches of the employee handbook.

11. ORS 652.140(1) reads: "[w]henever an employer discharges an employee or where such employment is terminated by mutual agreement, all wages earned and unpaid at the time of such discharge shall become due and payable immediately."

12. ORS 659.410 reads: "[i]t is an unlawful employment practice for an employer to discriminate against a worker with respect to * * * any term or condition of employment because the worker has applied for [workers' compensation benefits] * * *."

Interestingly, although Plaintiff claims that he does not have a copy of an earlier employee handbook, he cites exact page numbers of that "missing" handbook in his Amended Complaint.[13] Unless Plaintiff can produce a copy of the cited employee handbook issued prior to August 1992, Plaintiff cannot assert violations of it. As to Plaintiff's claim for breaches of the August 1992 employee handbook, I find that the disclaimer clause bars Plaintiff's claim. *See Mobley v. Manheim Services Corp.*, 133 Or. App. 89, 889 P.2d 1342 (1995) (disclaimer in Code of Conduct barred employee's claim for breach of contract based on terms and conditions of employment listed in the Code of Conduct).

Neither party has produced a copy of the employee handbook in effect prior to August 1992. However, unless Plaintiff can show that the prior handbook does not contain the disclaimer listed above, Plaintiff's claim will be DISMISSED. Furthermore, even if Plaintiff can produce such a handbook, any claim for breaches after the August 1992 handbook became effective are DISMISSED. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Fifth Claim is GRANTED IN PART and NEITHER GRANTED NOR DENIED IN PART.

## VI. Third, Sixth, and Eleventh Claims for Breaches of Contract

Defendants argue that Plaintiff's alleged contract exists only between Plaintiff and Computerland. Therefore, Plaintiff may not assert a breach of contract claim against Mr. Posner as the agent of the corporation. Defendants further argue that Mr. Posner did not have express, implied, or apparent authority to bind the corporation by his oral promises. Therefore, Plaintiff never entered into an enforceable contract with Computerland.

It is well settled that "[t]he agent who acts within the scope of his authority, discloses his representative capacity to the third party, and makes the contract in his principal's name, is not personally liable thereon." *Wiggins v. Barrett & Associates, Inc.*, 295 Or. 679, 698, 669 P.2d 1132 (1983) (citation omitted). In his Amended Complaint, Plaintiff states, "[a]t the time of the events giving rise to this complaint, defendants Posner and Amato were agents of defendant Computerland. All acts done by the defendants were impliedly or expressly approved by Computerland and at all times material defendants Posner and Amato were acting within the scope of their employment." Am.Compl. ¶ 8. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff Third, Sixth, and Eleventh Claims is GRANTED, and Mr. Posner is dismissed as a Defendant from these claims.

## VII. Seventh Claim for Fraud

In his seventh claim for relief, Plaintiff alleges that Defendants knowingly made false representations to Plaintiff with the intent to lure him from his former job to Computerland. Am.Compl. ¶ 89. Plaintiff further asserts that he reasonably relied on these misrepresentations to his detriment. *Id.*

Defendants argue that this claim must be dismissed for three reasons:

(1) there is no evidence that Plaintiff reasonably relied on the alleged misrepresentations because he read the terms of the offer letter before he quit his former job;

(2) Plaintiff ratified the fraud by signing the offer letter, and thus relinquished any fraud claim regarding his compensation level; and,

(3) Plaintiff's claim for fraud is barred by the two-year statute of limitations, ORS 12.110(1).[14]

---

**13.** It is curious that Plaintiff should seek to benefit from the existence of the handbook by asserting breaches of its specific language, but then claim that summary judgment is inappropriate because Defendants do not cite the proper handbook, which Plaintiffs cannot seem to find.

**14.** ORS 12.110(1) provides: "[a]n action * * * for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit."

I address each of Defendants' arguments in turn.

 First, whether Plaintiff relied on Defendants' alleged misrepresentations in terminating his former employment is a genuine issue of material fact because the parties dispute the date when Plaintiff gave notice to Compucom. In his deposition, after significant struggling,[15] Plaintiff states, "I *probably* received [the offer letter] before I gave notice to Compucom." Wright Aff. Ex. A, Blackthorne Dep. at 196. This is hardly an unequivocal response without room for clarification. Plaintiff testifies in his affidavit as follows:

> [i]n my deposition, I was not sure when I gave notice to my former employer because I did not have any documentation before me. After reviewing the documents, I recall that I gave notice to Com-

puCom * * * before I received any offer letter from Computerland.

Blackthorne Aff. ¶ 4. I find that Plaintiff's affidavit is not a "sham,"[16] therefore, the jury will resolve this apparent factual discrepancy.

 Second, Defendants correctly argue that

> one who has been induced by fraud to enter into a contract, subsequently, with knowledge of the fraud, enters into another agreement respecting the same transaction with the one guilty of the fraud, he, the injured party, thereby waives and relinquishes all right to damages on account of such fraud.

*Conzelmann v. N.W.P & D Prod. Co.*, 190 Or. 332, 354, 225 P.2d 757 (1950).

> Actual knowledge of the fraud is not a prerequisite to ratification; 'notice of the

---

**15.** The questions and answers were as follows:

Q. And at what point, you hadn't given notice to Compucom, had you?

A. I don't recall exactly what happened at that point in time, if I saw the offer before I gave my final notice, or what. I don't recall.

Q. Well, you said that you gave notice after you moved up to Portland; correct?

A. Yes.

Q. And you moved up Thanksgiving; is that correct?

A. To the best of my recollection.

Q. And do you think you gave notice after Thanksgiving? Do you think that's most likely?

A. Uh-huh. Yes.

 * * * * * *

Q. Okay. Now, seeing the letter now, does that help refresh your recollection that, in fact, you received it before you gave notice at Compucom?

A. I don't recall exactly when I gave notice at Compucom. I don't know.

Q. You said you thought it was most likely after Thanksgiving.

A. Yeah.

 * * * * * *

Q. And do you know what date you received this letter on?

A. No, not exactly.

Q. You can't say, sitting here today, one way or the other, whether you received it before or after you gave notice to Compucom; is that what you're saying?

A. It was probably—I probably received this before I gave notice to Compucom.

Wright Aff. Ex. A., Blackthorne Dep. at 193–96.

**16.** Defendants correctly stated at oral argument that the court may disregard an affidavit that the

court determines is merely a "sham." However, this rule must be applied "with caution" and " 'does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.' " *School Dist. No. 1J, Multnomah County v. ACandS, Inc,* 5 F.3d 1255, 1264 (9th Cir.1993) (quoting *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266–67 (9th Cir.1991)). "An inconsistent affidavit may preclude summary judgment * * * if the affiant lacked the access to material facts and the affidavit sets forth the newly-discovered evidence." *Kennedy* at 266 (citations omitted).

However, FRCP 30(e) prohibits Plaintiff's handwritten corrections to his deposition testimony, which were notarized on December 2, 1994, because they were untimely. FRCP 30(e) states,

> [i]f requested by the deponent or a party *before* completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate * * * whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.

No certificate on any of the depositions taken from Plaintiff indicates that Plaintiff requested review of the deposition before its completion. Wright Supp. Aff., Ex. A. Therefore, Plaintiff's opportunity to amend changes to the deposition has lapsed, and Plaintiff's errata sheet will not be received as part of the deposition testimony.

acts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is equivalent in the eyes of the law to knowledge of all facts a reasonably diligent inquiry would disclose.'

*Housley v. Linnton Plywood Assoc.*, 210 Or. 520, 529, 311 P.2d 432 (1957) (quoting *Whitney v. Bissell*, 75 Or. 28, 35, 146 P. 141 (1915)).[17] Though Plaintiff knew at the time he signed the offer letter (December 1991) that he would not start out at the higher TAE, he could not have known that Mr. Posner misrepresented his promise that Plaintiff would receive the higher TAE by January 1992.[18] Therefore, I cannot hold as a matter of law that by signing the offer letter Plaintiff waived his right to sue for fraudulent inducement of a contract.

■■■■ Third, the statute of limitations for a fraud claim is two years from the date "when the plaintiff knew or should have known of the alleged fraud." *Mathies v. Hoeck*, 284 Or. 539, 542, 588 P.2d 1 (1978). "Whether or not the plaintiff should have known of the fraud at a particular point in time is normally a question for the jury except where only one conclusion can reason-

ably be drawn from the evidence." *Id.* at 543, 588 P.2d 1. In this case, Plaintiff filed his action on March 16, 1994; therefore, his fraud claim is barred if he knew or should have known about the fraud by March 16, 1992. Based on Mr. Posner's repeated assurances throughout 1992 that Plaintiff would receive the higher TAE, I cannot hold as a matter of law that Plaintiff should have known by March 15, 1992 that Mr. Posner did not intend to raise Plaintiff's TAE.[19] Consequently, this issue will be submitted to the jury for their determination. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Seventh Claim is DENIED.

## VIII. Fourth Claim for Intentional Interference with Contractual Relations

■■■ Plaintiff alleges that Mr. Posner intentionally interfered with Plaintiff's contractual relationship with Computerland by distorting and hindering Plaintiff's performance. Am.Compl. ¶ 77. Defendants argue that Plaintiff's claim must be dismissed because Plaintiff alleges that Mr. Posner acted within

---

17. In *Housley*, the seller of land sued the purchaser because it refused to pay the full purchase price. 210 Or. at 526, 311 P.2d 432. The purchaser filed a counterclaim against the seller alleging that the seller misrepresented the amount of timber on the property. *Id.* at 526–27, 311 P.2d 432. The trial court found that the purchaser had been defrauded, but nevertheless held that it waived its right to rescind the fraudulently induced contract because it ratified the transaction by selling the property to a third party. *Id.* at 528, 311 P.2d 432. The Oregon Supreme Court affirmed the trial court's conclusion and stated that the purchaser "had notice of facts sufficient to put it upon inquiry." *Id.* at 529, 311 P.2d 432.

18. Plaintiff states in his affidavit that prior to signing the offer letter, "Mr. Posner represented to me that I would receive the amount of compensation originally represented once I became the branch sales manager of the Portland downtown branch in January 1992." Blackthorne Aff. ¶ 6.

At oral argument, Defendants asserted that, as a matter of law, Plaintiff could not reasonably rely on Mr. Posner's promises which contradicted express terms in the offer letter. (citing *Andrews v. Roy Motors*, 204 Or. 429, 283 P.2d 652 (1955)). In *Andrews* the plaintiff signed a written contract which expressly contradicted the

misrepresentations, and thus could not reasonably rely on the prior representations. 204 at 435, 283 P.2d 652.

By contrast, in the present action, Plaintiff knew that the terms of the offer letter contradicted Mr. Posner's oral representations. However, before Plaintiff signed the letter, he spoke to Mr. Posner about the terms of employment. At that time, Mr. Posner allegedly reassured Plaintiff that, regardless of the written offer letter, he would receive the higher TAE in January 1992. Blackthorne Aff. ¶ 6. Thereafter, Plaintiff signed the written offer. Consequently, I leave the issue of whether Plaintiff reasonably relied on Mr. Posner's representations for the jury.

19. Though Plaintiff clearly knew by February 1992 that he would not receive the higher TAE in January 1992, he did not necessarily know or should have known, in light of Mr. Posner's further assurances, that Mr. Posner did not intend to pay the higher TAE. Plaintiff's fraud claim is based on the misrepresentation that he would receive a higher TAE, not that he would receive that higher TAE by a specific date. Nonetheless, as the year progressed and Mr. Posner continually failed to deliver the higher TAE, at some point in time, Plaintiff should have discovered that Mr. Posner did not intend to raise Plaintiff's TAE.

the scope of his employment.[20] Because this allegation encompasses at least a partial motivation to serve the employer, it defeats an interference claim.[21]

Employees are immune from liability for intentional interference with a contractual relationship provided that the employee is (1) acting within the scope of his employment and (2) acting with at least partial intent to benefit the employer. *Welch v. Bancorp Management Advisors*, 296 Or. 208, 215, 675 P.2d 172 (1983), *modified on other grounds*, 296 Or. 713, 679 P.2d 866 (1984); *Petty v. Rogue Federal Credit Union*, 106 Or.App. 538, 544, 809 P.2d 121 (1991), *rev. den.*, 311 Or. 432, 812 P.2d 828 (1991). An allegation that the employee was acting within the scope of his employment encompasses at least a partial motive to serve his employer. *McGanty v. Staudenraus*, 123 Or.App. 393, 397, 859 P.2d 1187 (1993) (citing *Chesterman v. Barmon*, 305 Or. 439, 442, 753 P.2d 404 (1988)), *rev. allowed*, 319 Or. 211, 876 P.2d 784 (1994). Therefore, in *McGanty*, the court of appeals affirmed the dismissal of plaintiff's intentional interference of contract claim because plaintiff alleged that defendant was acting within the course and scope of employment. *McGanty* at 397, 859 P.2d 1187.

In this case, Plaintiff alleges that Mr. Posner acted within the scope of his employment. Am.Compl. ¶ 8. Therefore, Mr. Posner is immune from an action for intentional interference of Plaintiff's contractual relationship with Computerland. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Fourth Claim is GRANTED and Plaintiff's claim is DISMISSED.

## IX. Eighth Claim for Defamation

Plaintiff alleges that Mr. Posner injured his reputation by communicating false statements to third persons. However, Plaintiff provides only one specific defamatory remark: on November 22, 1992, Mr. Posner told Mr. Joshi that Plaintiff was spending his money on hookers in L.A. The statute of limitations for defamation is one year. ORS 12.120(2) ("An action for libel or slander shall be commenced within one year"). Plaintiff commenced this action on March 16, 1994, well over a year after the statement was made on November 22, 1992. Furthermore, Plaintiff fails to allege that any other defamatory remarks were communicated to third persons by Mr. Posner within a year of this suit. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Eighth Claim is GRANTED, and Plaintiff's claim is DISMISSED.

## X. Ninth and Tenth Claims for Invasion of Privacy

In these claims, Plaintiff alleges that Mr. Posner disclosed private medical and family matters to third persons and also placed Plaintiff in a false light by suggesting that Plaintiff was an incompetent manager. Am.Compl. ¶¶ 98, 101. Defendants argue, and I agree, that Plaintiff has failed to provide evidence that Mr. Posner sufficiently published the private facts and misrepresentations to support claims for disclosive or false light privacy.[22] Instead, the facts show that Mr. Posner made the alleged statements to no more than a handful of people.

Both disclosive privacy and false light privacy causes of action require a "public disclosure." *Tollefson v. Price*, 247 Or. 398, 401, 430 P.2d 990 (1967); *See also Magenis v. Fisher Broadcasting, Inc.*, 103 Or. App. 555, 557–58, 798 P.2d 1106 (1990) (false light privacy requires "publicity" as defined in the Restatement (Second) Torts § 652: "communicating it to the public at large"). "To constitute such a disclosure it must be public in the sense of communication either to the public generally or to a large number

---

**20.** Plaintiff alleges, "[a]t the time of the events giving rise to this complaint, defendants Posner and Amato were agents of defendant Computerland. All acts done by the defendants were impliedly or expressly approved by Computerland and at all times material defendants Posner and Amato were acting within the scope of their employment." Am.Compl. ¶ 8.

**21.** Plaintiff does not respond to Defendant's argument.

**22.** Plaintiff offers no response to Defendants' arguments.

of persons as distinguished from one individual or a few." *Tollefson v. Price*, 247 Or. 398, 402, 430 P.2d 990 (1967) (court held plaintiffs stated claims for disclosive and false light privacy where private facts and misrepresentations were written in a newspaper advertisement as well as posted in a local store).

Because Plaintiff fails to show that the private facts and misrepresentations were published to the public or to a large number of persons, Plaintiff cannot assert claims for false light or disclosive privacy. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Ninth and Tenth Claims is GRANTED, and Plaintiff's claims are DISMISSED.

## XI. First Claim for Intentional Infliction of Emotional Distress

■ Plaintiff claims that Mr. Posner intended to inflict severe emotional distress upon Plaintiff through a variety of conduct: vulgar language, verbal assaults, harassing and threatening messages, undermining his ability to perform as a manager, and failing to secure payment of promised compensation. Am.Compl. ¶ 62. Defendants contend that this claim must be dismissed for the following reasons:

(1) Mr. Posner did not intend to inflict severe emotional distress through vulgar language because Mr. Posner did not know that the language bothered Plaintiff;

(2) Plaintiff engaged in and consented to an exchange of foul language;

(3) Mr. Posner's conduct was not an extraordinary transgression of the bounds of socially tolerable conduct;

The Oregon Supreme Court set forth the following elements of a claim for intentional infliction of emotional distress:

(1) defendant intended to inflict severe emotional distress on the plaintiff,

(2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and

(3) the defendant's acts constitute an extraordinary transgression of the bounds of socially tolerable conduct.

*Madani v. Kendall Ford, Inc.*, 312 Or. 198, 203, 818 P.2d 930 (1991) (citation omitted) (court dismissed plaintiff's claim for intentional infliction for emotional distress where employer fired plaintiff for refusing to pull down his pants at employer's request).[23]

■ Plaintiff correctly argues that certain types of relationships between the defendant and the victim afford the victim greater protection. For example, in *Hall v. The May Dept. Stores*, 292 Or. 131, 637 P.2d 126 (1981), the Oregon Supreme Court recognized that employer/employee and doctor/patient relationships between the defendant and the victim, may entitle the victim to "a greater degree of protection from insult and outrage than if he were a stranger to defendants." *Id.* at 138, 637 P.2d 126 (citation omitted) (court held that a jury could find that severe interrogation by an employer who accuses an employee of theft, exceeds the outer bounds of socially tolerable employer practices, and thus permit a claim for intentional infliction of emotional distress).

■ Nevertheless, even if a relationship exists which "imposes on defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock," the court must still determine whether the actions "qualify as extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior * * *." *Id.* at 137, 637 P.2d 126.

■ In considering whether the defendant's acts were an extraordinary transgression of the bounds of socially tolerable behavior, the key focus is "on the purpose and the means used to achieve it." *Patton v. J.C. Penney Co.*, 301 Or. 117, 123, 719 P.2d 854 (1986) (court dismissed employee's com-

---

**23.** I will not elaborate on the first element of the cause of action because Mr. Posner's intent to cause distress is an issue for the jury. Furthermore, with regard to the second element, Plaintiff adequately supplemented the record with the affidavit with Douglas Johnson, M.D., who is Plaintiff's treating psychiatrist and who states that Mr. Posner's vulgar and foul language, in part, caused Plaintiff's psychiatric conditions.

plaint alleging that employer intentionally inflicted emotional distress by discharging the employee because he was socializing with a co-worker). The conduct must be deliberate and the means of inflicting the harm must be extraordinary:

'[t]he additional requirement that defendant's means of inflicting the injury must have been extraordinary is explained as necessary, first, to distinguish actionable conduct from insults, ill temper, and offensive jokes that persons are expected to endure * * * and second, to provide a setting of objective reality for a claim of harm that otherwise rests only on evidence of the plaintiff's subjective reaction divorced from physiological or other tangible injury.'

*Id.* at 123, 719 P.2d 854 (quoting *Brewer v. Erwin*, 287 Or. 435, 457, 600 P.2d 398 (1979)). "The tort does not provide recovery for the kind of temporary annoyance or injured feelings that result from friction and rudeness among people in day-to-day life." *Shay v. Paulson*, 131 Or.App. 270, 884 P.2d 870 (1994) (court dismissed complaint alleging that defendant intentionally inflicted emotional distress by forging plaintiff's name on magazine order forms).

■■■■ In this case, although Plaintiff used of foul language, I cannot hold as a matter of law that Plaintiff consented to all of Mr. Posner's verbal abuses; this is an issue for the jury. Furthermore, the facts suggest that Mr. Posner managed employees through severe intimidation. Whether this exceeded the bounds of socially tolerable conduct, with respect to Plaintiff, is also a jury question. Although the Court may forgive behavior which is "rude, boorish, tyrannical, churlish, and mean," *Patton* at 124, 719 P.2d 854, I find that the sum total of Mr. Posner's conduct, coupled with the employer/employee relationship with Plaintiff, is sufficiently outrageous to have this claim resolved by the jury. Therefore, Defendants' Motion for Summary Judgment of Plaintiff's First Claim is DENIED.[24]

## XII. Second Claim for Negligence

■■■ Plaintiff states that Computerland negligently hired and retained Mr. Posner, which caused Plaintiff to sustain emotional and physical injury including gastrointestinal complications. Am.Compl. ¶ 68. Defendant argues that Plaintiff's claim for an on-the-job injury resulting from his employer's negligence is preempted and exclusively covered by Oregon Workers' Compensation Law.

Oregon Workers' Compensation Law ("Workers' Compensation") provides the exclusive remedy for "compensable injuries:"

The liability of every employer * * * is **exclusive and in place of all other liability** arising out of *compensable injuries* to the subject workers * * *.

ORS § 656.018(1)(a) (emphasis added). A "compensable injury" is defined as "an accidental injury, arising out of and in the course of employment requiring medical services * * *." ORS § 656.005(7)(a). "[A]n injury is accidental if the result is an accident, whether or not due to accidental means * * *." *Id.*

---

24. Though the parties do not directly address the issue of Computerland's vicarious liability for Mr. Posner's alleged intentional infliction of emotional distress, I will briefly discuss the applicable law. An employer is vicariously liable for the intentional tortious act of an employee

(1) if the act took place within the temporal and spatial limits of the employment relationship;

(2) if the employee was motivated, at least in part, by a motive to serve the employer; and

(3) if the act was one that the employee was hired to perform.

*Whelan v. Albertson's, Inc.*, 129 Or.App. 501, 508, 879 P.2d 888 (1994) (reversing trial court's dismissal of claim against employer and remanding to determine if employee's alleged intentional infliction of emotional distress occurred within the scope of employment) (citing *Chesterman v. Barmon*, 305 Or. 439, 442, 753 P.2d 404 (1988)); *Mains v. II Morrow, Inc.*, 128 Or.App. 625, 631, 877 P.2d 88 (1994) (held that employer's liability for the alleged intentional infliction of emotional distress by an employee was a question for the jury). Whether an employee is acting within the scope of his employment when he commits a tortious act is a question of fact for the jury. *Mains* at 632, 877 P.2d 88.

I find that Plaintiff has alleged sufficient facts regarding Mr. Posner's conduct to permit the jury to consider whether Computerland may be held vicariously liable if it concludes that Mr. Posner intentionally inflicted severe emotional distress upon Plaintiff.

The Oregon Court of Appeals advances the following factors to be considered in determining whether something is a "compensable injury:" (1) the relationship between the injury and employment, (2) whether the injury arose out of the employment, and (3) the existence of an enhanced risk of injury caused by the nature of the job or job environment. *Carr v. U.S. West Direct Co.*, 98 Or.App. 30, 34–35, 779 P.2d 154 (1989), *rev. den.*, 308 Or. 608, 784 P.2d 1101 (1989).

In this case, Defendant correctly asserts that Plaintiff's alleged injury arose out of his employment with Computerland, and resulted from an enhanced risk created by the job environment. Plaintiff essentially seeks tort damages for work-related stress which is an injury commonly covered under Workers' Compensation. *See, e.g., Leary v. Pacific Northwest Bell*, 296 Or. 139, 675 P.2d 157 (1983) (court remanded to determine whether plaintiff's stress was work-related, and thus compensable, or merely self-inflicted, non-compensable injury).[25]

Because Plaintiff's emotional distress is covered by Oregon Workers' Compensation Law, Defendants' Motion for Summary Judgment on Plaintiff's Second Claim is GRANTED, and Plaintiff's claim is DISMISSED.

## XIII. Remedies Sought Under Contract Claims

In his Third and Sixth Claims for Breach of Contract, Plaintiff seeks compensatory damages for mental pain and suffering as well as punitive damages. Defendants correctly argue that these remedies are unavailable for breaches of contract.[26] *Farris v. United States Fidelity and Guaranty Co.*, 284 Or. 453, 456, 466–67, 587 P.2d 1015

(1978). Accordingly, Defendant's Motion for Summary Judgment on these remedies is GRANTED.

## CONCLUSION

In accordance with the foregoing discussion, Defendants' Motion for Summary Judgment (# 41–1) is GRANTED IN PART AND DENIED IN PART. IT IS SO ORDERED.

---

**25.** Contrary to Plaintiff's contentions, *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or. 509, 888 P.2d 544 (1995), is not applicable to the present action. In *Errand*, after the Workers' Compensation Board affirmed the referee's decision that plaintiff's workers' compensation claim did not involve a "compensable" injury, the Oregon Supreme Court concluded that the exclusivity clause of Workers' Compensation Law, ORS 656.018(1), does not bar a direct tort action against plaintiff's employer. *Id.* at 513–14, 525, 888 P.2d 544.

By contrast, in this case, Plaintiff's workers' compensation claim was denied by the insurer

for lack of evidence that the alleged injury was work-related. Wright Supp. Aff., Ex. D. Plaintiff failed to seek administrative review of this denial and procure a determination that his injury was not "compensable" under Workers' Compensation Law. I disagree with Plaintiff's contentions that the insurer's denial of Plaintiff's claim for lack of evidence constitutes a sufficient determination that Plaintiff's injury is not "compensable." Accordingly, I find that Plaintiff alleges a "compensable injury" under Workers' Compensation.

**26.** Plaintiff offers no response to this argument.