In re John Lee GRANT, M.D., Debtor.

Jeffrey H. Parker, Susan L. Parker, Executors of the Estate of Gwen Lynch, Rebecca Edens, Plaintiffs,

v.

John Lee Grant, M.D., Defendant.

Bankruptcy No. 98–26581–SCS.
Adversary No. 98–2213–S.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

July 7, 1999.

## MEMORANDUM OPINION & ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter came on for trial on May 4, 1999 on the Amended Complaint of Jeffrey H. Parker, et al.,[1] against John Lee Grant, M.D. ("Dr. Grant"). After consideration of the evidence at trial and the arguments of counsel, the court makes the following finds of fact and conclusions of law.

### FINDINGS OF FACT

This dispute involves a determination by this court as to whether Dr. Grant's responsibility for certain damages which allegedly occurred in the course of his lease of a condominium known as 116 Sandyport Development in New Providence, Bahamas ("Condo") is nondischargeable pursuant to 11 U.S.C. § 523(a)(2). Dr. Grant filed a petition under Chapter 11 of the United States Bankruptcy Code in this Court on September 4, 1998. Scheduled as contingent and disputed debt was an unsecured indebtedness to Jeff Parker, et al., in the amount of $21,004.31.

Among the few matters to which the parties agree is that a certain lease dated August 8, 1997 was entered into by and between Gwen Lynch and John L. Grant and Stephanie Hannis–Grant for the rental

1. The Complaint and the Amended Complaint pled as plaintiffs Jeffrey H. Parker, Susan L. Parker, Gwennie L. Lynch and Rebecca Edens, who were alleged to be creditors of Dr. Grant. On April 19, 1999, the plaintiffs moved to substitute or join as a party plaintiff the Executors of the Estate of Gwen Lynch. An order was entered on April 20, 1999 substituting the Executors of the Estate of Gwen Lynch as a party plaintiff in the place of Gwen Lynch. On April 15, 1999, Dr. Grant moved for summary judgment in part alleging that Gwen Lynch was deceased, and, inasmuch as the lease upon which the plaintiffs based their claim was between Dr. Grant and Gwen Lynch, only she among the plaintiffs was entitled to maintain the complaint. At a hearing on the motion for summary judgment conducted immediately prior to the trial here, counsel for the plaintiffs advised the court that Susan L. Parker and Rebecca Edens are the daughters of Gwen Lynch and the sole executors of her estate. Susan L. Parker was advised to be the spouse of Jeff Parker, who in large part managed the condominium which was the subject of the lease but has no ownership interest therein. It is undisputed the subject lease is solely between Dr. Grant, Stephanie Hannis–Grant and Gwen Lynch. Therefore the court partially granted the motion for summary judgment dismissing Rebecca Edens, Susan L. Parker and Jeffrey H. Parker as individual plaintiffs and retaining as plaintiffs in their capacity as Executors of the Estate of Gwen Lynch.

of the condominium for a period of one year expiring on August 8, 1998 ("Lease").[2] The Lease required a rental payment of $5,500.00 each month payable in advance. Additionally, the Lease required payment of the last month's rental at the time of the lease signing, together with a deposit against breakage, damage or non-payment of utility bills in the like amount of $5,500.00. Section 2.10 of the Lease provided that the premises would be used only for the purpose of a private residence for the tenant and his family. It is unclear whether Dr. Grant or Stephanie Hannis[3] ("Hannis") paid the required $16,500.00 to initiate the Lease to Damianos Realty Company, Ltd. ("Damianos"), a Bahamian realty company representing the Condo Owners; however, it is undisputed the requisite monies were paid and forwarded to Gwen Lynch, less a $5,500.00 finders fee paid to the realtor.

It is the circumstances of the entry into the Lease which forms the basis of the controversy here. The saga began on August 8, 1997 when Christy Winner ("Winner"),[4] who went by the surname of Callender at the time, received a telephone message from Dr. Grant staying in the Bahamas at a Radisson Hotel. Winner is employed by Damianos, who had been instructed by the Condo Owners to seek rentals for the premises. Winner returned the call to Dr. Grant at the hotel, where it was answered by a woman who introduced herself as Mrs. Grant. The woman advised Winner that she was there to view some properties and wanted to look at houses or apartments to rent right away. Winner went to the hotel to meet them, where Dr. Grant and Hannis met her outside the hotel. Dr. Grant came first, shook Winner's hand and introduced himself as Dr. Grant and his companion as

his wife, Mrs. Grant. They proceeded with Winner to inspect the Condo. While there, the woman identified as Mrs. Grant advised that Dr. Grant would be flying back and forth from the United States while she would be staying at the Condo with her mother and children. The dispatch with which Dr. Grant sought to rent the Condo was explained to Winner as necessary because Hannis and her mother both had health problems. After inspecting the Condo, Dr. Grant and Hannis decided to accept the premises.

Winner brought Dr. Grant and Hannis to meet Kay Duckworth ("Duckworth"), an agent from the Sandyport Development where the condo is located. Dr. Grant did not introduce himself to Duckworth, but instead Winner introduced Dr. Grant and Hannis to her as Dr. and Mrs. Grant. Hannis again stated in the presence of Duckworth that she wished to move in right away. Duckworth had concerns about Dr. Grant and Hannis, feeling that "[Hannis] didn't seem like the type of person who would be married to a brain surgeon or any doctor"[5] and thought they might have been there "having a fling." Pls.' Ex. 2, p. 24.

After Dr. Grant and Hannis decided to let the Condo, Winner prepared the Lease for execution. Winner prepared the Lease to be executed by "Dr. and Mrs. John Grant," but, upon Dr. Grant's request, the tenants under the Lease were changed to "John Grant and Stephanie Hannis Grant." Thereafter, Dr. Grant and Hannis executed the Lease and made the required deposits and first month's rent. The Lease was forwarded to the owners of the Condo for their acceptance. Duckworth apparently had immediate misgivings about the

---

**2.** The Condo was titled, at the time of the entry into the Lease, in the names of Gwen Lynch, Rebecca Edens and Susan Parker, who are collectively referred to as the "Condo Owners."

**3.** While the Lease was executed by "Stephanie Hannis–Grant," for consistency the Court

will refer to her as Stephanie Hannis or "Hannis."

**4.** Winner testified by *de benne esse* deposition.

**5.** Dr. Grant has been a board certified neurosurgeon since 1983.

transaction and called Virginia Damianos, the head of Damianos, approximately an hour after Dr. Grant and Hannis left the Sandyport Development office. Duckworth asked Virginia Damianos if she had done a due diligence or any check into the background of Dr. Grant and Hannis. Virginia Damianos replied, "All I know is I have the deposit." *Id.* at 10. Duckworth replied that, "If Mr. Parker agrees, fine." *Id.* Winner had less concern about the haste of the transaction as she indicated, "In my line of work, we have that happen all the time." Pls.' Ex. 3, p. 18.

Jeff Parker ("Parker"), the son-in-law of Gwen Lynch,[6] recalls being contacted by Duckworth on August 8, 1997 concerning the suitability of the Lease with Dr. Grant and Hannis and was advised the proposed tenants were a "brain surgeon" and his wife from Virginia who had a sick mother-in-law. Tr. Transcript, p. 178. Duckworth stated while a tenant was willing to rent the condo, "It wasn't what we were looking for."[7] *Id.* The Condo Owners prior to the Lease had enlisted Parker as their agent to represent their interests in the construction and renting of the Condo. After construction was completed, Parker had asked Duckworth to look for prospective tenants for the Condo. Parker's preferences for prospective tenants as expressed to Duckworth were for a two to three year lease with an oil company or a bank. Parker never expressed any preference to Duckworth that the tenants for the condo be a married couple; rather, his primary expressed goal appeared to be to lease to a credit-worthy corporate tenant for a multi-year term. Winner, Duckworth and Parker apparently never made any inquiries into the circumstances of Dr. Grant or Hannis; Parker does not recall making any inquiries about the prospective tenants nor what questions the rental agents may have asked of them. Parker testified that his wife expressed concerns about the Lease because the tenant was not a bank. However, by this time Parker had executed the Lease on behalf of Gwen Lynch, having in hand the substantial deposit made by Dr. Grant and Hannis, and believing he had a neurosurgeon obligated thereon. Parker also testified he was swayed to execute the Lease by the fact it was allegedly to provide a place for the sick mother-in-law of Dr. Grant, thinking that Dr. Grant "was a caring man that cared about his family." *Id.* at 199. Parker's belief he had rented to a neurosurgeon and his wife was reinforced later when Dr. Grant called him in Chattanooga, Tennessee to demand installation of a security alarm system for the Condo and stated "[my] wife . . . [is] driving . . . [me] nuts, calling at all hours of the day asking for this alarm system. . . ." *Id.* at 145.

After occupation of the Condo by Dr. Grant and Hannis, the September 1997 rent was paid by a cashier's check received from Dr. Grant. However, an attempt to pay for the October 1997 rent failed when a check drawn by Dr. Grant on an account at BB & T Bank was returned unpaid. Parker sought to contact Dr. Grant concerning this default and was advised that Dr. Grant was in bankruptcy and Mrs. Grant had enough money to pay the rent.[8] Parker attempted to contact Hannis, but never received a return call. Parker then instructed the owners of the Sandyport Development to evict Dr. Grant and Hannis from the condo.[9]

Upon eviction, Gwen Lynch traveled to the Bahamas to inspect the condominium and discovered a substantial amount of

---

6. Gwen Lynch became deceased after the events which surround the controversies of the Complaint.

7. Duckworth was not asked to testify concerning any conversation she may have had with Parker.

8. Dr. Grant did not file his petition in bankruptcy under Chapter 11 until September 4, 1998.

9. It is not clear from the evidence at trial who actually occupied the Condo during the tenancy and what, if any, family relationship they shared with Dr. Grant or Hannis.

damage had occurred to the Condo. Gwen Lynch undertook the repairs, paying for a portion of them in cash.[10] Previously, Parker had discovered Dr. Grant and Hannis had failed to pay the bills for water usage at the condo and unpaid electric bills were discovered after eviction which were paid by Parker as well. In addition, the Bahamas Electric Company required a $1,600.00 deposit to return electricity to the condo.[11] The physical damages claimed by the condo owners totaled $2,012.25. This amount was combined with the amounts expended for the unpaid water bills of $487.06 and the electric deposit of $1,626.00 and the returned check fee of $10.00 and was offset against the damage deposit of $5,500.00 tendered by Dr. Grant and Hannis at the lease inception. The condo was not reoccupied until February 1, 1998, which established the rent claim of the condo owners of $15,070.[12]

■ A proper calculation of the damages claimed by the plaintiffs here is as follows:

10. The amounts claimed for damages by the plaintiffs are as follows:

| | |
|---|---|
| Microwave | $850.00 |
| Repainting | $786.25 |
| Kitchen Cabinets | $475.00 |
| Carpet Cleaning | $121.00 |
| Missing Inventory | $500.00 |
| Maid Cleaning | $130.00 |

At trial, the plaintiffs failed to establish that Gwen Lynch had expended monies to replace the microwave, as the only evidence produced was a check made payable to cash in the amount of $900.00 dated December 9, 1997. No witness or document could establish Lynch utilized the proceeds of this check to buy a new microwave for the condo.

11. The deposit demand from the electric company introduced by the plaintiffs states on its face, "Security Deposit Non Transferable, Refundable Only Upon Finalization of Account." Pls.' Ex. 26. Despite this language, Parker maintains this deposit is fully non-refundable.

12. The Condo Owners claim unpaid rent for the months of October, November and December 1997 and for the period January 8–31, 1998, totaling $20,570.00. Applied against this amount is the last month's rental deposit

| Unpaid Rent | |
|---|---|
| October 1997 | $ 5,500.00 |
| November 1997 | $ 5,500.00 |
| December 1997 | $ 5,500.00 |
| January 8–31, 1998 | $ 4,070.00 |
| | $20,570.00 |
| Less last month's rent deposit | $ 5,500.00 |
| Total Rent Claim | $15,070.00 |
| **Physical Damages to Condo** | |
| Repainting | $ 786.25 |
| Kitchen Cabinets | $ 475.00 |
| Carpet Cleaning | $ 121.00 |
| Missing Inventory | $ 500.00 |
| Maid Cleaning | $ 130.00 |
| | $ 1,912.25 |
| **Unpaid Utilities/Miscellaneous** | |
| Water | $ 487.06 |
| Electricity | –0– [13] |
| Returned Check Fee | $ 10.00 |
| | $ 497.06 |
| Less Damage Deposit [14] | $ 5,500.00 |
| | $ 5,002.94 |
| Less Damage to Condo | $ 2,012.25 |
| | $ 2,990.69 |
| Less Total Rent Claim | $15,070.00 |
| Total Claim | $12,079.31 [15] |

Dr. Grant offered no enlightenment as to the circumstances of the Lease at trial. With the exception of a handful of general questions about his background as a neurosurgeon, Dr. Grant declined to answer virtually all the questions posed to him at trial by counsel for the condo owners and, in each instance, asserted as his basis his right against self-incrimination under the

of $5,500.00 made by Dr. Grant/Hannis, for a total rent claim of $15,070.

13. Despite the testimony of Parker, the deposit demand for electricity explicitly states on its face that it is refundable upon the finalization of the account. A proper measure of the damage incurred by the reason of the necessity for the Condo Owners to post the $1,626.00 deposit would appear to be better measured by a reasonable return on the loss of use of the monies for the period the deposit would be retained, which period could be estimated. As no such evidence was introduced, the court declines to consider the deposit as part of the damage claim.

14. The Lease states the deposit of $ 5,500.00 is "as a deposit against breakage damage or non-payment of utility bills...." Pls.' Ex. 1, p. 1. While an offset against unpaid rents is not contractually provided for in the Lease, the condo owners would be entitled to offset these monies based upon general principles of set-off.

15. The condo owners also claim as damage their costs and attorney fees. No proof of either was offered at the trial.

Fifth Amendment to the United States Constitution.[16] The Condo Owners, through their counsel, solicited Dr. Grant to admit many aspects of their allegations concerning the circumstances of the Lease, including the nature of his relationship to Hannis, his alleged participation in the misrepresentation of his marital status to Hannis and his alleged knowledge that Hannis had rented the Condo for the purpose of fleeing arrest and prosecution for various serious criminal charges.[17] None of these questions brought any response other than the Fifth Amendment invocation by Dr. Grant. However, Dr. Grant through his answer to the Complaint, his interrogatory answers admitted into evidence and his stipulation of facts made with the plaintiffs has provided some minimal information relevant to the circumstances at issue here. Dr. Grant has admitted he did sign the Lease. He has also admitted at the time of the execution of the Lease he was and remains married to a person other than Hannis, and that the relationship with Hannis was that of a "friend."

The Complaint filed by the Condo Owners alleges that Dr. Grant knowingly and falsely represented that Hannis was his wife and that the plaintiffs relied upon this false representation. Specifically, the plaintiffs allege that they limited rental of this property to families to prevent this type of damage and they relied upon Dr. Grant's marital status as security for the Lease. As a proximate result of this false representation, the plaintiffs believe Dr. Grant obtained a leasehold interest in their property and the debts owed to them by reason of the Lease are, therefore, nondischargeable pursuant to 11 U.S.C. § 523(a)(2).

Dr. Grant defends on a number of bases. First, he denies that he made representations or that the plaintiffs relied on any alleged representations relating to whether Hannis was his wife. Secondly, Dr. Grant asserts the damage or loss of rent complained of by the Condo Owners was not proximately caused by any alleged misrepresentation by Dr. Grant as to his marital status with Hannis. In addition, Dr. Grant has objected to the consideration by the court of the *de bene esse* testimony of Winner and Duckworth who are crucial to the case of the plaintiffs as all direct contact with Dr. Grant and Hannis in the procurement of the Lease occurred with them. Dr. Grant's objection is founded upon the fact as of the time of trial the transcripts of the depositions of Winner and Duckworth had not been signed by the witnesses, nor had the reading and signing of the depositions been waived. Upon this basis, Dr. Grant urges the court not to admit these transcripts in evidence, thus depriving the plaintiffs of a critical link in their evidence.[18]

An additional legal issue was also raised at trial by the plaintiffs being, the extent to which the court, as the trier of fact, may make negative inferences from the frequent exercise by Dr. Grant of his Fifth Amendment privilege against incrimination as a basis to refuse to answer many of the questions posed by plaintiff's counsel in his examination.

The court will first consider whether the deposition transcripts of Winner and Duckworth should be properly admitted into evidence here, notwithstanding the failure of either Winner or Duckworth to sign them prior to their proffer at trial. Secondly, the court will consider whether it should make negative inferences in its

---

**16.** Dr. Grant asserted his Fifth Amendment privilege 83 times during his examination by counsel for the Condo Owners.

**17.** Plaintiffs have requested that the court, as the finder of fact in this matter, make appropriate negative inferences from Dr. Grant's use of his Fifth Amendment privilege to de-

cline to answer these questions. See Section II, *infra*.

**18.** The court at trial took under advisement the objection of Dr. Grant to the deposition transcripts of Winner and Duckworth. See Section I, *infra*.

fact finding because of the repeated assertion by Dr. Grant of his Fifth Amendment privilege. Finally, we will turn to the merits and assess whether the plaintiffs have proven by a preponderance of the evidence the elements necessary to recover under 11 U.S.C. § 523(a)(2)(A).

## I

### Should the Depositions of Winner and Duckworth be Admitted?

The *de bene esse* depositions of Duckworth and Winner were taken on March 31, 1999 by telephone.[19] At the conclusion of each deposition, plaintiff's counsel requested that each deponent review, sign and return the deposition.[20] Winner signed her deposition without evidencing any changes on May 7, 1999; Duckworth signed her deposition on May 13, 1999 while detailing two minor alterations on her errata sheet. Defendant first knew of plaintiff's use of the Duckworth and Winner depositions at trial on April 23, 1999 when plaintiff served defendant with a copy of the proposed trial exhibit list. On April 27, 1999, defendant filed objections to the use of the deposition transcripts at trial on the sole ground that they were not signed as required by Federal Rule of Civil Procedure 30(e) ("Rule 30(e)"). No other suggestion has been made that any irregularities or errors occurred in the taking, transcription or preparation of the depositions.[21]

Defendant argues that since the deposition transcripts were completed on April 8, 1999, both deponents had ample opportunity to review, read and sign, and then re-turn the depositions with any corrections before the trial date. Plaintiff contends that the date of trial, May 4, 1999, is not the proper deadline for the deponents' reading and signing their depositions; plaintiff proposes that Rule 30(e) states the deadline for reading and signing as 30 days after the reporter makes the deposition available. Therefore, plaintiff argues that Winner's deposition is admissible, as she read and signed her deposition on May 7, 1999, within the 30 day period proscribed by Rule 30(e). While admitting that Duckworth's deposition was not timely signed, plaintiff contends that Duckworth has waived only her privilege to read, review and make corrections to her deposition. Consequently, her deposition should be admitted as taken as "[t]he consequence of waiver, of course, being that the original deposition is admitted into evidence with no changes." Pls.' Br., p. 6 n. 4.

Federal Rule of Civil Procedure 30(e), made applicable here by Federal Rules of Bankruptcy Procedure 7030, states as follows:

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and reasons given by the deponent for making them.

F.R.C.P. 30(e).[22]

Plaintiff contends that the court reporter made the deposition transcripts avail-

---

**19.** The plaintiffs and defendant agreed to have the depositions taken by telephone and that the court reporter would be present in Norfolk, Virginia, not in the Bahamas.

**20.** Plaintiff's counsel said to Duckworth: "I'm going to have you sign this deposition, unless you want to waive signing. We would rather have you sign it. We'll probably mail it and have you notarize it down there." Pls.' Ex. 2, p. 26. At the conclusion of Winner's deposition, plaintiff's counsel stated: "We'll

send you down a copy [of the transcript] and have you read it and sign it and send it back." Pls'. Ex. 3, p. 21.

**21.** The pretrial order entered in this Adversary proceeding established April 5, 1999 as the cutoff date for all discovery. The trial of the matter was conducted on May 4, 1999.

**22.** The Advisory Committee Notes to Rule 30(e) state as follows:

able on April 9, 1999. Defendant argues that reporter's certificates were completed on April 8, 1999 and assumed that they were made available to the deponents on that date. This Court notices that both reporter's certificates demonstrate that the transcripts were completed and made available to deponents on April 8, 1999.

Plaintiff argues Rule 30(e) provides deponent with a 30 day period to read, correct and sign a deposition, notwithstanding a trial date. Defendant contends that plaintiff had sufficient time from defendant's objection on April 23, 1999, to secure deponents' signature before trial and, therefore, plaintiff should be prohibited from using either deposition at trial. Rule 30(e) clearly states a 30 day time limitation for modification of transcripts and fails to formulate any exception to the rule. Therefore, this Court rejects defendant's argument and agrees with plaintiff that the 30 day period proscribed by Rule 30(e) is applicable here.

Debtor cites *Smith v. Insurance Co. of North America*, 30 F.R.D. 534 (M.D.Tenn. 1962), for the proposition that the Winner and Duckworth depositions should not be admitted at trial. The *Smith* court interpreted and applied an earlier version of Rule 30(e). Congress has amended Rule 30(e) twice since 1962, once in 1970 and again in 1993, to provide a clearer guide as to reviewing and signing requirements for alterations of depositions. This Court feels it more prudent to focus on case law interpreting an updated version of Rule 30(e).

The Court in *Blackthorne v. Posner*, 883 F.Supp. 1443, 1454 (D.Or.1995) ruled that plaintiff made handwritten corrections to his deposition transcript after the 30 day limitation and, therefore, found plaintiff to have waived his privilege to read, review and amend. *See Barlow v. Esselte Pendaflex Corp.*, 111 F.R.D. 404, 406 (M.D.N.C.1986) (holding that where plaintiff made so many changes to his deposition testimony that it became impossible for the reporter to enter the alterations and deeming "[p]laintiff to have refused to have signed, or to have waived signing of ... the transcript as set out in Rule 30(e)").[23] The *Blackthorne* court subsequently allowed plaintiff to admit his deposition testimony into evidence without the untimely corrections. The court held: "[plaintiff's] opportunity to amend changes to the deposition had lapsed, and plaintiff's errata sheet will not be received as part of the deposition testimony." *Blackthorne*, 883 F.Supp. at 1454 n. 16.

The Second Circuit ruled similarly in *Podell v. Citicorp Diners Club*, 112 F.3d 98 (2nd Cir.1997). The *Podell* court held that notwithstanding any errata modifications, Rule 30(e) allows the original deposition to be admitted at trial. *Id.* at 103. The court in *Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D.Ill.1981) reached an analogous result, holding that where a deponent amends his deposition, his original deposition testimony shall remain admissible at trial. The *Lugtig* court stated that "[n]othing in the language of Rule 30(e) requires or implies that the original answers are to be stricken when changes are made ...," implying that the original deposition is admissible at trial, regardless of deponent's decision to amend his deposition or waive that privilege. *Id.* at 641–42.

---

Various changes are made in this subdivision to reduce problems sometimes encountered when depositions are taken stenographically. Reporters frequently have difficulties obtaining signatures—and the return of the depositions—from deponents. Under the revision pre-filing review by the deponent is required only if requested before the deposition is completed. If review is requested, the deponent will be allowed 30 days to review the transcript or recording and to indicate any changes in form or substance. Signature of the deponent will be required only if review is requested and changes are made.
F.R.C.P. 30(e) Advisory Committee Notes.

**23.** Furthermore, the court stated that "the transcript ... [is] an accurate representation of the deposition testimony." *Barlow*, 111 F.R.D. at 406.

■ In the case at bar, it is clear that plaintiff's counsel asked both Duckworth and Winner to read and sign their own deposition transcripts before the deposition was completed. Additionally, the transcripts support the proposition that neither Duckworth nor Winner waived her right to read and sign her deposition transcript. In Winner's case, this Court finds that Winner read and signed her deposition evidencing no changes on May 7, 1999, within the 30 day limit prescribed by Rule 30(e). Therefore, this Court holds that Winner satisfied the formal requirements of Rule 30(e) and, consequently, Winner's deposition is admissible at trial.

■ In Duckworth's case, the issue rests on the fact that she failed to timely sign and make corrections to her deposition testimony. After reviewing Rule 30(e), the accompanying Advisory Committee Notes, and the applicable case law, this Court concludes that in a situation where a deponent is requested to read and review his deposition and deponent makes no changes to the deposition transcript, that deponent has effectively waived any right he had to modify his transcript. Rule 30(e) and the Advisory Committee Notes require signature by the deponent only if requested and if changes are made before the 30 day limitation expires. Here, Duckworth failed to evidence any changes within the 30 day period after presentment of the deposition transcript. In light of *Blackthorne,* by Duckworth's failing to make changes to her deposition testimony, she effectively waived her privilege to do so. However, it does not logically follow that deponent's failure to read, sign and modify precludes the use of her original unaltered deposition at trial. *Podell* and *Lugtig* clearly state that a failure to read, review and sign within the 30 day constraint constitutes only a waiver of deponent's right to correct mistakes in his deposition testimony and does not affect the

original deposition's admissibility. Consequently, this Court finds that Duckworth waived her privilege to amend her deposition testimony by not reading and signing despite plaintiff's counsel's request. She did not, however, waive any privilege to use her original deposition testimony at trial. Therefore, this Court deems Duckworth's original deposition testimony admissible at trial.

## II

## May the Plaintiffs Utilize Dr. Grant's Invocation of his Fifth Amendment Privilege Against Self–Incrimination As Affirmative Evidence At Trial?

Dr. Grant utilized his Fifth Amendment privilege against self-incrimination and declined to answer the queries relating to the circumstances of the making of the Lease or the occupation of the Condo posed to him by counsel for the plaintiffs. This assertion by Dr. Grant of his Fifth Amendment privilege forms the basis of the plaintiff's argument that the court should draw a negative inference from this invocation and, in essence, assume Dr. Grant would have answered each of these questions in the manner most adverse to his interests in this matter.

Dr. Grant was the first witness called by the plaintiffs. After answering some general questions concerning his residential address, practice history and business address, and current marital status, Dr. Grant was asked if he had a child named Stephanie, which evolved his assertion of this Fifth Amendment privilege and his declination to answer the question. Counsel for the plaintiffs immediately moved for the entry of summary judgment against Dr. Grant on the basis of his assertion of his privilege against self-incrimination. Plaintiff's motion was denied by the court.[24]

---

24. At the time of denial of the oral motion for summary judgment by the plaintiffs, the Court stated from the bench that it was inappropri-

ate that summary judgment be entered solely on the basis of Dr. Grant's assertion of his Fifth Amendment privilege. *See National Ac-*

After answering questions relating to his children and whether he was in bankruptcy in August, September or October 1997, Dr. Grant then declined to answer a question asking whether his bank account had been frozen in October 1997. This response began a succession of assertions by Dr. Grant of his Fifth Amendment privilege to a series of questions concerning the entry into the Lease, the address listed for Dr. Grant and Hannis on the Lease, the alleged representation of Hannis that she was the spouse of Dr. Grant, the nature of his relationship with Hannis, the correspondence and conversations of Dr. Grant with Parker, the activity in Dr. Grant's bank account, his travel to the Bahamas, his alleged representations to Winner, and his meeting with Duckworth. Finally, counsel for the plaintiffs asked if, 1) at the time of his travel to the Bahamas, did Dr. Grant know Hannis was being sought by federal authorities for criminal misconduct; 2) she was involved in prostitution; and, 3) by representing that Hannis was his wife, did Dr. Grant not represent to Winner and Duckworth the true nature of her occupation and relationship to him. These inquiries provoked the final assertion of the Fifth Amendment privilege by Dr. Grant.

Thus, the vast majority of the inquiries to which Dr. Grant asserted his Fifth Amendment privilege closely relate to the circumstances of the meetings with Winner and Duckworth which ultimately lead to the making of the Lease. A number of the other lines of inquiry appear to pertain to matters not highly relevant or at issue here, such as whether and when Dr. Grant traveled to the Bahamas, activity in his bank account during the tenancy and conversations and correspondence of Dr. Grant with Parker, all of which allegedly occurred after the making of the Lease.

■ The application of the Fifth Amendment to prohibit the compulsion of disclosures which would incriminate a witness obviously is bedrock among the principles of American constitutional law.

Where the Fifth Amendment privilege is asserted by a party in a civil action rather than a criminal prosecution, the full implications to the party of the assertion of the privilege is less certain. While courts have often observed that "attempts ... to make the assertion of the Fifth Amendment privilege 'costly', as the result of the invocation alone ..." are inappropriate, *In re Caucus Distributors, Inc.*, 83 B.R. 921, 926 (Bankr.E.D.Va.1988), many have likewise expounded that an invocation of the Fifth Amendment by a civil litigant is not necessarily a cost free exercise. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 320, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976); *Centennial Life Ins. Co. v. Nappi*, 956 F.Supp. 222, 228 (N.D.N.Y.1997). Despite this seeming ambiguity as to the implications of the assertion of the Fifth Amendment privilege by a civil party to prevent testimony, an examination of the case law provides an able framework to this Court to properly analyze the weight which should be given to Dr. Grant's frequent assertion of the privilege here.

The Supreme Court in *Baxter* delineated the limits of both the sword and shield of the Fifth Amendment when asserted by a civil party. There a prisoner invoked his Fifth Amendment privilege in the course of a prison disciplinary hearing. In stating its belief the disciplinary hearing was civil in nature, the Court stated that while the prisoner may use his privilege to decline to testify, "silence in the face of accusation is a relevant fact not barred by the Due Process Clause." *Baxter*, 425 U.S. at 319, 96 S.Ct. 1551. Critical to the analysis by the Court was the concept that the "adverse inferences" against the asserting party were triggered by the introduction of probative evidence by the adverse party, finding that it was "undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the

ceptance Co. of Am. v. Bathalter, *705 F.2d* *924, 932 (7th Cir.1983).*

Disciplinary Board." *Id.* at 317, 96 S.Ct. 1551.

This theme is mirrored in subsequent cases considering the issue in different contexts. In *Bathalter*, 705 F.2d at 932, a defendant pled to the complaint lodged against him his refusal to either admit or deny the allegations founded upon his assertion of his Fifth Amendment privilege. The plaintiff moved for entry of a summary judgment on the basis the privilege based refusal to admit or deny entitled it to have all allegations taken as admitted. In denying the summary judgment motion, the Court relied on the ruling in *Baxter* to conclude that founding an adverse judgment solely upon the assertion of the Fifth Amendment privilege would represent an unconstitutional compulsion against assertion of the privilege. *Id.* at 930.

 Plaintiffs do not appear to disagree in their post-trial reply memorandum with the teachings of these cases, variously stating, "given the introduction of other probative evidence against the party claiming the privilege, these adverse inferences can support a judgment against the silent party" and "[c]oupled with probative evidence against the party who refuses to testify ... this negative inference is enough to support an adverse decision against the silent party." Pls.' Reply to Defs.' Post Tr. Mem., p. 2, 7. The recognition of the necessity to introduce probative evidence conversely dooms the efforts of the plaintiffs to use the invocation of the Fifth Amendment by Dr. Grant to establish proof of facts where no evidence was introduced or admitted.[25] In evaluating whether plaintiffs have succeeded in carrying their burden of proof as to each element which must be shown to prevail in their Complaint, the Court will assess whether Dr. Grant's refusal to answer pro-

---

**25.** The plaintiffs at trial appeared to advocate that they had established Hannis was fleeing arrest from federal charges when Dr. Grant rented the Condo and argued that once proven it provides an additional misrepresentation relied upon by Parker. Specifically, the Condo Owners believe that by refusing to answer the question as to whether he knew Hannis was renting the Condo to flee prosecution for serious federal charges, Dr. Grant admitted the same. The plaintiffs then postulate that Dr. Grant, having knowledge of this flight by Hannis, should have disclosed this fact to Parker who would not have rented the Condo to Dr. Grant and Hannis if armed with this knowledge. In their post-trial reply memorandum, the plaintiffs suggest they were improperly foreclosed by the Court's evidentiary rulings from proving that Dr. Grant by "housing a prostitute who was fleeing federal prosecution" was "truly blameworthy," apparently attempting to refute Dr. Grant's reliance in his post-trial memorandum on *In re Baietti*, 189 B.R. 549, 554 (Bankr.D.Me.1995) which stated a debtor must not only have engaged in conduct that is in a technical and legal sense violative under § 523(a)(2)(A), but also evidence conduct of a "truly blameworthy" nature. Pls.' Reply to Defs.' Post Tr. Mem., p. 22–23. The line of argument fails for a number of reasons. First, and perhaps most importantly, the allegation of a failure by Dr. Grant to make such a disclosure appears nowhere in the Complaint and nothing in the record suggests Dr. Grant had any notice of this claim which is markedly different than the asserted claim that Dr. Grant misrepre-

sented he was married to Hannis. Federal Rule of Bankruptcy Procedure 7009 (incorporating F.R.C.P. 9) requires that allegations of fraud be pled with specificity and this material deviance from the facts plead in the Complaint could in no manner be admitted into evidence. Furthermore, the proof of the underlying assertion offered by the plaintiffs of Hannis' alleged misdeeds and flight was an indictment and subsequent guilty plea to federal charges of Hannis which occurred approximately one year after the making of the Lease and an order by the Circuit Court of the City of Suffolk in the matter of the divorce of Dr. Grant from his wife requiring Dr. Grant not to take his children into the presence of Hannis. Each proffer, even had the objection by Dr. Grant on the grounds of relevancy and materiality not been sustained, provide little, if any, probative support for the extent of Dr. Grant's knowledge at the making of the Lease. As aforesaid, Dr. Grant's mere refusal to answer questions alone cannot be used to affirmatively establish such alleged facts. Finally, this Court believes any requirement that it find Dr. Grant's conduct not only violative of 11 U.S.C. § 523(a)(2)(A) but also "truly blameworthy" is contrary to the weight of decided authority in both this district and circuit, which consistently require proof by a preponderance of the elements as set forth in Section III, *infra* and do not seek to add some subjective, qualitative assessment by this Court of the culpability of any defendant.

vides an inferential supplement to the evidence which was accepted at trial.

## III

### A. Is the Indebtedness Under the Lease Nondischargeable As To Dr. Grant?

#### Introduction

▨ "To further the policy of providing a debtor with a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor." *In re Barr*, 194 B.R. 1009, 1016 (Bankr.N.D.Ill. 1996) (citing *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir.1995), *cert. denied*, 516 U.S. 1008, 1012, 116 S.Ct. 563, 567, 133 L.Ed.2d 488 (1995)). In a § 523(a) matter (as made applicable here by 11 U.S.C. § 1141(d)(2)), the objecting creditor must establish nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

The plaintiffs ground their nondischargeability action on 11 U.S.C. § 523(a)(2)(A), alleging false pretenses, false representations, and actual fraud. Jurisdiction over this matter lies under 28 U.S.C. § 1334(b) as a matter arising under 11 U.S.C. § 523(a) and 11 U.S.C. § 1141. This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) because it relates to the dischargeability of debts. Venue is appropriate under 28 U.S.C. § 1409 and Local Rules 102 and 107(a)(2).

#### *§ 1141 and § 523(a)(2)(A)*

Section 1141(d)(2) provides "[t]he confirmation of a plan does not discharge an individual debtor from any debt excepted from discharge under Section 523 of this title." 11 U.S.C. § 1141(d)(2) (1999).[26] Accordingly, even though Dr. Grant is proceeding under Chapter 11 of the Bankruptcy Code, Section 1141 permits the plaintiffs to utilize Section 523 to prohibit the discharge of this indebtedness.

▨ Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services ... to the extent obtained by ... false pretenses, a false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A)(1999). Most courts agree that the traditional elements of an action for fraud must be established to prevail on a claim of nondischargeability under § 523(a)(2)(A). *In re Simos*, 209 B.R. 188, 191 (Bankr.M.D.N.C.1997). Thus, for the plaintiffs to prevail, they must prove the following elements:

(1) That the debtor made a representation;

(2) That at the time the representation was made, the debtor knew the representation was false;

(3) That the debtor made the false representation with the intention of deceiving the creditor;

(4) That the creditor relied on such representation; and

(5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*Id.* E.g., *In re Valdes*, 188 B.R. 533, 535 (Bankr.D.Md.1995); *In re Carrier*, 181 B.R. 742, 746 (Bankr.S.D.N.Y.1995).

### A. Did Dr. Grant Make a Misrepresentation?

▨ The Condo Owners allege the misrepresentation of Dr. Grant's marital status with Hannis as the sole ground for their § 523(a)(2)(A) nondischargeability claim. As a starting point, this Court notes that a breach of contract does not, by itself, establish misrepresentation for purposes of § 523(a)(2)(A). *In re Barr*, 194 B.R. at 1017 (citing 3 Collier on Bankruptcy ¶ 523.08 at 523–54 (15th ed.1994)). *See also In re Keller*, 72 B.R. 599, 602–03 (Bankr.M.D.Fla.1987). However, if a debtor enters into a contract with no intent to fulfill the terms of the contract and

---

**26.** At the time of trial, Dr. Grant had not filed a proposed plan of reorganization.

later defaults, the contract may provide a basis for a nondischargeability claim based on fraud. *In re Barr*, 194 B.R. at 1018 (citing *In re Guy*, 101 B.R. 961, 978 (Bankr.N.D.Ind.1988)).

 Courts generally categorize representations as either express or implied. "A false representation is an express misrepresentation, while a false pretense refers to an implied misrepresentation of 'conduct intended to create and foster a false impression.'" *In re Newmark*, 20 B.R. 842, 854 (Bankr. E.D.N.Y.1982) (quoting *In re Schnore*, 13 B.R. 249, 251 (Bankr.W.D.Wis.1981)). *See also In re Scott*, 201 B.R. 424, 430 (Bankr.E.D.Va.1996) (citing *In re Bozzano*, 173 B.R. 990, 993 (Bankr.M.D.N.C. 1994)); *In re Bebber*, 192 B.R. 120, 123 (W.D.N.C.1995). This court has previously held that no overt misrepresentation is required under § 523(a)(2)(A); a misrepresentation regarding a material fact may be implied from one's silence. *In re Kahler*, 187 B.R. 508, 512 (Bankr.E.D.Va. 1995) (citing *In re Bozzano*, 173 B.R. at 993)). *See also In re Scott*, 201 B.R. at 430–31; *In re Booker*, 165 B.R. 164, 169 (Bankr.M.D.N.C.1994) (stating "omissions can constitute representations … especially where the circumstances of the case create a false impression which is known by the debtor"); *In re Kramer*, 38 B.R. 80, 82 (Bankr.W.D.La.1984).

 There is sufficient evidence here, that by signing the Lease contemporaneously with Hannis who signed as "Stephanie Hannis–Grant," Dr. Grant created a false impression he and Hannis were married. This, coupled with the circumstances of the representations to Winner of Dr. Grant and Hannis as to their married status at the time of the entry into the Lease, provides ample basis to conclude Dr. Grant made one or more misrepresentations as to his marital status.

At the time of execution of the Lease, Dr. Grant requested the signatories to be changed from "Dr. And Mrs. John Grant" to "John Grant and Stephanie Hannis–Grant." Dr. Grant and Hannis each contemporaneously executed the Lease in this form as tenants, which would logically convey the notion that Dr. Grant and Hannis were husband and wife. Dr. Grant knew or should have known that this Lease as so executed would be forwarded for review and execution by the Condo Owners [27] and would lead a reasonable person to believe Dr. Grant and Hannis were married.

 The circumstances of the negotiation of the Lease similarly confirms the deception engaged in by Dr. Grant as to his marital status with Hannis. When Winner first met Dr. Grant and Hannis outside their hotel, Dr. Grant introduced Hannis as his wife. Previously, Hannis made references to herself as Mrs. Grant when first telephoned by Winner. Hannis and Dr. Grant were introduced to Duckworth by Winner as Dr. and Mrs. Grant while they both were present. While the introduction to Winner obviously constitutes an overt misrepresentation, Dr. Grant's silence in the face of the representations by Hannis as Dr. Grant's spouse and by Winner to Duckworth as "Dr. And Mrs. Grant" is equally culpable. As this Court has previously stated:

> [m]isrepresentation may be implied by silence. No overt misrepresentation is required under § 523(a)(2)(A). Instead, omissions or a failure to disclose by the debtor can constitute misrepresentation for the purposes of nondischargeability where the circumstances of the cases are such that the omissions or failure to disclose creates a false impression which is known by the debtor.

*In re Kahler*, 187 B.R. at 512. Dr. Grant made several misrepresentations to the nature of his relationship·to Hannis: his overt misrepresentation of permitting the Lease to be signed in a manner which conveyed the unavoidable impression Dr. Grant and Hannis were married, his intro-

---

**27.** The Lease in fact was executed on behalf of the Condo Owners by Parker as their agent.

duction of himself and Hannis as husband and wife to Winner, and his silence while Hannis held herself out as Mrs. Grant to Winner and Duckworth. Furthermore, this conclusion is supplemented ably by Dr. Grant's refusal to refute any such evidence by his invocation of his Fifth Amendment right against self-incrimination. His silence in the face of this evidence does not advance his cause to defeat the affirmative evidence of his holding himself out as married to Hannis at the time of the making of the Lease.

However, the inquiry need not end there because of the unusual factual circumstances. Typically where instances of an alleged misrepresentation are asserted as a basis for nondischargeability, the misrepresentations are made directly to the creditor or, at the least, in the presence of the creditor. Here nearly all the misrepresentations alleged by the plaintiffs which occurred in the course of the negotiation, execution and acceptance of the Lease were transmitted by third parties. Complicating this aberration is the fact the transmission of information by these third party real estate agents was made not to the creditor Condo Owners, but rather to the agent of the Condo Owners, Parker.[28] This atypical methodology of the conveyance of the misrepresentations which occurred here as to the marital status of Dr. Grant and Hannis requires the Court to further examine the unusual facts in the case at bar.

 Certain cases have made clear that the indebtedness of a principal may be found to be nondischargeable where the agent of the principal makes misrepresentations to a creditor within the scope of his authority or at the direction of the principal. *See, e.g., In re Cohn,* 54 F.3d 1108, 1119 (3rd Cir.1995); *In re Brown,* 162 B.R. 342, 344 (Bankr.M.D.Fla.1993). The Court has discovered no reported case which duplicates the factual scenario here where the misrepresentations at least in part were made to agents of the creditor. However, since the creditor logically may only rely upon whatever information that is actually conveyed by the agent, it is incumbent to examine what misrepresentations of Dr. Grant were actually transmitted to the plaintiffs here. While there is no evidence from Duckworth directly as to what information concerning Grant and Hannis was conveyed to Parker, Parker's testimony was clear he was contacted by Duckworth on August 8, 1997 and was advised that the prospective tenants for the Condo were a "brain surgeon" and his wife from Virginia who had a sick mother-in-law.[29] While Parker was not an owner of the Condo, he apparently had been delegated the authority by the Condo Owners to make the decision to accept or reject a particular tenant or lease proposal, and in fact had already executed the proposed Lease with Dr. Grant and Hannis prior to consulting with any of the Condo Owners, including his wife. Thus, the misrepresentation by Dr. Grant as to his marital status with Hannis was transmitted to Parker, who possessed the authority to bind the Condo Owners. This, combined with the fact the Lease itself conveyed the misrepresentation of the marriage of Dr. Grant and Hannis which was ultimately sent to Parker, constitute a sufficient connection to establish that the misrepresentation of Dr. Grant here was conveyed to Parker as agent for the plaintiffs.

28. While Parker, under cross examination by counsel for Dr. Grant, maintained he was an owner of the Condo, the plaintiffs have stipulated the owners of the Condo at all times relevant hereto were Gwen Lynch, Rebecca Edens and Susan Parker.

29. Parker in his testimony also recites two instances after execution of the Lease where Dr. Grant made allusions to his "wife" in the context of inducing Parker to put an alarm system in the Condo and as an alternative source for collection of the rent. As these possible misrepresentations occurred after execution of the Lease there can have no effect on the discharge of the debt here. *In re Taylor,* 58 B.R. 849, 852 (Bankr.E.D.Va.1986) (citing 3 Collier on Bankruptcy ¶ 523.08[4], at 523–49 (15th ed.1985)).

## B. Did Dr. Grant Know the Representations were False?

The second element requires the Plaintiffs prove that the Debtor knew or should have known that the representations were false at the time the representation was made. The plaintiffs allege that Dr. Grant knew he was not married to Hannis at the time he contracted to lease the Condo.

This Court is convinced that both the express and implied representations were made by Dr. Grant concerning his marital status with Hannis. No evidence here suggests any circumstances existed where Dr. Grant could have believed he was actually married to Hannis.

## C. Did Dr. Grant Possess the Intent to Deceive?

■■■■ Since a debtor rarely admits to possessing the requisite intent to deceive, intent may be inferred from an examination of the surrounding circumstances.[30] *In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987); *In re Yamada,* 197 B.R. 37, 39 (Bankr.E.D.Va.1996); *In re Kahler,* 187 B.R. at 513; *In re Bebber,* 192 B.R. at 124; *In re Bozzano,* 173 B.R. at 995. "[A]n intent to deceive may be inferred from a false representation which the debtor should have known would induce a creditor." *In re Bebber,* 192 B.R. at 124 (citing *In re Kimzey,* 761 F.2d 421 (7th Cir.1985)). This Court has previously held that when a debtor recklessly makes false representations that he should know will induce another to rely thereon, intent to deceive may be inferred for purposes of § 523(a)(2)(A). *In re Kahler,* 187 B.R. at 513 (citations omitted). This recklessness "must exceed negligence and rise to the level of reckless disregard for the truth." *Id.* (citations omitted). Intent to defraud must exist at the time the debtor made the representations; any subsequent conduct that is contrary to the original representation does not necessarily indicate that the original representation was false. *In re Boese,* 8 B.R. 660, 662 (Bankr.D.S.D.1981).

■■■ Dr. Grant argues the evidence here fails to reveal a fraudulent intent on his part, arguing that he would have needed to know that being married to Hannis was a necessary condition to rent the Condo. His inability to know this is found, according to Dr. Grant, in the testimony of Parker as to the absence of any instructions to the leasing agents that only married couples occupy the Condo. Dr. Grant thus suggests to this Court that, for the purposes of establishing his intent here, we examine the minds of Parker, Duckworth and Winner rather than his own. While such an examination is highly relevant to explore whether there was any reliance on the misrepresentations of Dr. Grant, it sheds little light on our determination of Dr. Grant's motives.[31] The circumstances of the entry into the Lease provide ample support for the inference that, for whatever ultimate design, Dr. Grant desired to create the illusion of this marriage for the benefit of the leasing agents who negotiated the Lease with him. Dr. Grant has elected, by the invocation of his Fifth Amendment privilege, not to supplement the circumstantial evidence here and, therefore, has not rebutted the intent to defraud displayed by the plaintiffs. Whether or not Dr. Grant specifically comprehended that occupation of the Condo by a married couple was a condition precedent to the lease, Dr. Grant and Hannis elected to hold themselves out as married to each other for whatever benefit they believed might result therefrom; as such, this Court concludes Dr. Grant possessed the requisite intent of deceiving the Condo Owners as to his marital status with Hannis.

See *In re Ketaner,* 154 B.R. 459, 465 (Bankr. E.D.Va.1992).

---

**30.** Once a creditor has provided circumstantial evidence giving rise to this intent, a debtor cannot overcome the inference by making unsupported assertions of honest intent. *In re Yamada,* 197 B.R. 37 (Bankr.E.D.Va.1996).

**31.** See Section D, *supra.*

## D. Did the Condo Owners Justifiably Rely on the Representations?

The fourth element of fraud requires the plaintiffs to prove that they relied on the Debtor's statements. In 1995, the Supreme Court adopted the common-law standard of justifiable reliance, rather than the more stringent standard of reasonable reliance.[32] *Field v. Mans*, 516 U.S. 59, 71–75, 116 S.Ct. 437, 444–46, 133 L.Ed.2d 351 (1995). Under this standard, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 70, 116 S.Ct. 437. In several common-law states adopting this standard, it was interpreted as imposing no duty to investigate, absent factors arousing suspicion. *Id.* at n. 12 (citing *Franklin v. Nunnelley*, 242 Ala. 87, 89, 5 So.2d 99, 101 (1941) (imposing no duty to investigate in absence of anything that would awake suspicion)).

Justifiable reliance is not without its limits; however, one "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. . . ." *Id.* 116 S.Ct. at 444 (quoting Restatement (Second) of Torts (1976) comment to a § 541). Thus, if one has a warning of deception, one needs to investigate on his own. *Id.* (citing W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)).

In the case *sub judice*, the Condo Owners allege justifiable reliance on Dr. Grant's misrepresentations of his marriage to Hannis and suggest they would not have entered into the Lease but for this misrepresentation. The evidence here strongly suggests there was no reliance on Dr. Grant's misrepresentation by the Condo Owners. Parker, who acted as agent for the Condo Owners in the construction and leasing of the Condo, was candid in his testimony as to the importance of having a married couple lease or occupy the premises. After completion of construction of the Condo, Parker communicated to Duckworth that the Condo Owners were looking for a corporate rental such as a bank or oil company who rent a residence for their employees and families to stay. In addition, Parker advised of a preference for a long term rental of two to three years. Parker openly admitted that had a bank rented the Condo, it was of no moment to him who was occupying the premises, and Parker specifically stated that with a bank ultimately obligated as the tenant, it would not have mattered if the bank had placed an unmarried couple into the property. Tr. Transcript, p. 173–76. Parker never mentioned to Duckworth that it was important that the tenants of the Condo be married. Rather, the creditworthiness of the prospective tenant appeared to be the only salient consideration to Parker. Parker conceded in making the decision to rent the Condo, the criteria was the "[a]bility to pay and the stability of the person or corporation that . . . would be there." *Id.* at 173. As Parker succinctly testified, a decision to rent would be founded upon proposed renters' ability "to pay $5,500.00 a month plus the deposits." *Id.*

The specific decision to rent the Condo to Dr. Grant and Hannis was also apparently dictated by Parker's conclusion Dr. Grant was a creditworthy prospective tenant. Notwithstanding his previously stated preference for a bank tenant, Parker decided to execute the Lease based upon the fact Dr. Grant and Hannis had made a substantial deposit and upon Dr. Grant's represented status as a neurosurgeon. As again succinctly stated by Parker, "I

---

**32.** The inquiry under the standard set forth in *Field v. Mans* focused on whether the falsity of the representation should have been "readily apparent" to the person to whom it was made. The reasonable reliance standard would focus on whether reliance was reasonable under the "hypothetical average person" standard. 4 Collier on Bankruptcy ¶ 523.08[1][d](15th ed.)

thought that a brain surgeon would have the ability to pay $5,500.00 a month." *Id.* at 178. Parker's assertion at trial that he wished to rent to a married couple because he believed collection of rent would be easier than had the premises been rented to an unmarried couple is betrayed by the overwhelming evidence that Parker and the Condo Owners elected to enter into the Lease with Dr. Grant and Hannis solely based upon the substantial rent and damage deposits made by the prospective tenants and the assumption Dr. Grant's occupation as a neurosurgeon would prove stable and lucrative enough to pay the rent for a year. For whatever reason, this assumption proved to be false.[33] However, Dr. Grant's misrepresentation as to his marital status appears to have played virtually no role in the decision by the Condo Owners to enter into the Lease.[34] While the Supreme Court has made clear the necessary reliance by a creditor need only be justifiable, nonetheless some reliance must be found. Here the record reveals none. As such, this Court must conclude the plaintiffs have failed in their proof of this necessary element of reliance.

### E. Were the Condo Owners' Damages Proximately Caused by the Representations?

█ Finally, to prevail under § 523(a)(2)(A), plaintiff must prove that the claim to be discharged "arose from an injury proximately resulting from the plaintiff's reliance on an intentionally made false representation." *In re Russell,* 203 B.R. 303, 313 (Bankr.S.D.Cal.1996) (citing *In re Britton,* 950 F.2d 602, 604 (9th Cir. 1991)); *see In re Baiata,* 12 B.R. 813, 819

(Bankr.E.D.N.Y.1981) (citing *In re Miller,* 5 B.R. 424 (Bankr.W.D.La.1980)).

█ The Restatement (Second) of Torts defines proximate cause as encompassing "(1) causation in fact, which requires a defendant's misrepresentations to be a 'substantial factor in determining the course of conduct that results in [the plaintiff's] loss' ... and (2) legal causation, which requires the plaintiff's loss to have been 'reasonably expected to result from the reliance.'" *In re Russell,* 203 B.R. at 313 (citing Restatement (Second) of Torts § 548A).

The Condo Owners allege a causal connection between the misrepresentation by Dr. Grant of his marital status with Hannis in the Amended Complaint when they state: "[p]laintiffs specifically limited rental of this property to families to prevent the type of damage that resulted from this lease agreement." Am. Compl. ¶ 7. When asked to amplify the type of damage that resulted from the Lease, plaintiffs identified ten items of physical damage which they alleged occurred at the Condo during the tenancy of Dr. Grant and Hannis.[35] While not mentioned in their response to Dr. Grant's discovery, the Condo Owners also presumptively believe their loss of rent unpaid by the tenants is a proximate result of Dr. Grant's misrepresentation as to his marital status with Hannis. Thus, assuming plaintiffs proved the other elements, the court must assess whether Dr. Grant's misrepresentation constituted a "substantial factor in determining the course of conduct which resulted in the claimed loss of plaintiffs" or whether the loss of rents and the physical damage to the Condo were reasonably expected to

---

**33.** The reason for Dr. Grant's financial problems which led to his inability to pay the October rent for the Condo is not revealed by the evidence at trial.

**34.** Parker also suggested in his testimony he was influenced by what he described as the alleged purpose of the rental to provide a residence for Dr. Grant and Hannis' "sick mother-in-law;" and stated: "we thought that this was a caring man that cared about his

family." Tr. Transcript, p. 199. This sentiment, however sincere, again appears to be overwhelmed by the candid testimony of Parker of the influence of the substantial deposit and the presumed earning capacity of Dr. Grant.

**35.** The answer to this interrogatory by plaintiffs was admitted at trial as defendant's Exhibit F.

result from the reliance by the plaintiffs of the misrepresentation as to his marital status with Hannis. *In re Russell,* 203 B.R. at 313.

The decision of *In re Vamvakaris,* 197 B.R. 228 (Bankr.E.D.Va.1996) illustrates the nexus which must be shown between the misrepresentation and the actual damage alleged. There the plaintiff met with a jewelry dealer to discuss selling a jewelry collection. When an inquiry was made by the plaintiff about the availability of theft insurance coverage, the debtor represented to plaintiff that he was "adequately covered" by theft insurance. The plaintiff left the jewelry collection with the debtor for sale at the debtor's business location. Later, the debtor advised the plaintiff that there had been a disappearance of jewelry from his store, including a portion of the plaintiff's jewelry. After a second theft of a portion of the jewelry left with the dealer, the debtor admitted there was no insurance coverage for either loss. After determining there had been a misrepresentation by the debtor of his availability of theft insurance coverage, the *Vamvakaris* court analyzed whether the plaintiff had proved the necessary element of proximate cause:

> The real issue of fraud here goes to the loss of jewelry and not to the lack of insurance. Thus, the loss was caused by thefts of jewelry. There is no evidence that the debtor fraudulently intended to deprive plaintiff of the jewelry or that he was in any way responsible for the loss. Debtor's misrepresentations about insurance coverage were not the proximate cause of the plaintiff's loss....
>
> ....

[T]here is simply no evidence here of a correlation between debtor's misrepresenting his theft insurance coverage and the subsequent loss of plaintiff's jewelry. The debtor did not intend to cause inquiry. And even though debtor's misrepresentation may be considered a deliberate and intentional act, it did not directly or necessarily lead to the loss of plaintiff's jewelry.

*Id.* at 231.

■ The absence of a causal connection between Dr. Grant's misrepresentation as to his marital status with Hannis and the damage alleged here is evident. There is simply no basis to attribute the inability of Dr. Grant to ultimately pay the rent accruing upon the Condo or the physical damage thereto to the representation of marital status by Dr. Grant.[36] There is no evidence here that a failure to pay rent or the occurrence of physical damage to the rental premises would logically follow the rental to a couple who were not married. The damages complained of rather appear to be the result of causes wholly unrelated to the misrepresentation of marital status. The failure to pay rent or to damage the premises cannot have been reasonably expected from any reliance here.

The plaintiffs, however, argue that in essence the misrepresentation was the *sine qua non* here, as but for the belief by Parker that Dr. Grant was married to Hannis, the Condo Owners would not have entered into the Lease. Therefore, the plaintiffs assert, any loss which ultimately occurred during the tenancy must be the proximate result of the misrepresentation

---

**36.** An additional flaw of causation exists for the portion of the damages claimed by plaintiffs consisting of the physical damages to the Condo caused by the occupants during the tenancy of Dr. Grant and Hannis. The plaintiffs claim physical damages in the amount of $2,862.25, representing repainting, kitchen cabinet repair, replacement of a microwave, carpet cleaning, maid cleaning and missing inventory. Pls.' Ex. 32. However, Dr. Grant and Hannis made a deposit upon the execution of the Lease in the amount of $5,500.00 to pay for any "breakage, damage or non-payment of utility bills" which occurred. Pls.' Ex. 1, p. 1. The physical damages and amounts unpaid for utility bills totaled less than $5,500.00 and were deducted by the plaintiffs from the breakage deposit. Tr. Transcript, p. 194. Accordingly, the only actual unpaid damages claimed by the plaintiffs is for rent. *See supra,* p. 105 and accompanying notes.

by Dr. Grant. However, this argument suffers a factual flaw. The weight of the evidence here shows the factor of Dr. Grant's purported marriage to Hannis as an inducement to entry into the Lease by the Condo Owners was of little or no import. The testimony of Parker shows the overwhelming consideration in entering into the Lease was the presumed ability of an American neurosurgeon to make the rental payments when due and the substantial deposits tendered by Dr. Grant and Hannis. The fabricated marriage of Dr. Grant and Hannis was simply of little or no moment in the decision by plaintiffs to accept the Lease.

Plaintiffs also rely on a series of professional licensing cases typified by the decision of *In re Pleasants*, 231 B.R. 893 (Bankr.E.D.Va.1999). This reliance is misplaced under the factual scenario here. In *In re Pleasants*, the homeowners entered into a construction agreement for revocations and an addition to their home with debtor, who had previously misrepresented himself as being an architect. In finding the debtor liable for the faulty construction of the renovations and addition, the court found that the debtor "operated under incomplete plans, and structural problems and code violations plagued the project ..." for which the debtor was liable because he "misrepresented his credentials, thereby inducing ... [the homeowner] to hire an unqualified firm...." *Id.* at 899. *See also In re Bozzano*, 173 B.R. 990, 992 (Bankr.M.D.N.C.1994); *In re Baiata*, 12 B.R. 813, 819 (Bankr.E.D.N.Y.1981); *Pruett v. Moon (In re Moon)*, Case No. 96–42453 (E.D.Va.1997). The instant situation differs in that decisions where debtor makes misrepresentations of his construction experience or having a necessary professional license or training to induce entry into a construction contract, the misrepresentation goes to the very essence of the agreement, i.e. the reliance by the debtor that the contracting party has the requisite knowledge, experience and training to properly construct an edifice. When later it appears that the promised building or dwelling is improperly constructed or defective, it is logical to conclude these flaws derive directly from the lack of professional qualifications of the debtor. It is far less cogent to conclude, as the facts here suggest, that the default in the payment of rent by Dr. Grant flows proximately from his misrepresentation of his marital status with Hannis. This is particularly so where the reliance placed upon the marital status of Dr. Grant by Parker and the Condo Owners to decide to enter into the Lease is so negligible. Accordingly, the Court finds the plaintiffs have failed to prove that their damages of unpaid rent under the Lease were proximately caused by the misrepresentation of Dr. Grant.

## IV

### Should Judgment Be Awarded Against the Plaintiffs for the Costs and Attorney's Fee Incurred for the Defense of the Complaint?

Having found the Complaint of the Condo Owners to be insufficient for the reasons aforesaid, the Court must finally consider the prayer for recovery of his costs and attorney's fee in the defense here by Dr. Grant. Reliance for such a recovery is placed upon 11 U.S.C. § 523(d) (1999), which provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

Dr. Grant argues the provisions of § 523(d) have been satisfied here, as the debt involved was a consumer debt, for which discharge was denied. Further, Dr. Grant asserts the actions of the plaintiffs here were not substantially justified and

special circumstances do not exist to prevent the award of costs and attorney's fees in this matter. The plaintiffs argue to the contrary, believing there was substantial justification for the Complaint and that Dr. Grant's frequent invocation of his Fifth Amendment privilege provides the special circumstances necessary to prevent an award of attorney's fees and costs under § 523(d).

However, before conducting an application of the provisions of § 523(d) to the facts and circumstances here, the Court must answer a threshold question: do the provisions of § 523(d) necessarily govern these proceedings? Here, unlike the overwhelming majority of adversary proceedings brought to determine non-dischargeability, the instant Complaint must be founded on 11 U.S.C. § 1141 as the petition filed by Dr. Grant rests under Chapter 11. While § 1141(d)(2) obviously makes reference to § 523 in its statement that confirmation of a plan of reorganization does not operate to discharge an indebtedness provided for in § 523, the issue becomes clear: is this reference sufficient to incorporate other provisions appearing there, including the award of costs and attorney's fees contemplated by § 523(d)? [37] As always, the plain language of the statute is the starting point for any such analysis. *United States v. Ron Pair Enterprises,* 489 U.S. 235, 242–43, 109 S.Ct. 1026, 1031–32, 103 L.Ed.2d 290 (1989). The reference in § 1141(d)(2) does not, on its face, necessarily appear to incorporate all of the provisions of § 523. However, a clearer intention may be found in the opening language of § 523, where in section (a) it is stated "[a] discharge under

section ... 1141 ... of this title does not discharge an individual from any debt...." 11 U.S.C. § 523(a)(1999). This appears to manifest a Congressional intention to make § 523 applicable to Chapter 11 proceedings and logically this reference provides no basis to conclude any intention to exclude § 523(d) from its stated application. Further evidence of Congressional intention may be found in U.S.C. § 103(a) of the Bankruptcy Code, which provides "except as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under chapter ... 11 ... of this title." 11 U.S.C. § 103(a)(1999). Accordingly, the provisions of § 523(d) are applicable and the court must consider its implications under the facts here.

The obligation represented by the Lease is an indebtedness incurred by an individual primarily for a personal, family or household purpose and thus is a consumer debt, for which a declaration of nondischargeability pursuant to § 523(a)(2) of the Bankruptcy Code was sought by the Condo Owners. Thus, the burden then shifts to the plaintiffs to show either that their position in this proceeding was substantially justified or special circumstances here would make an award unjust in this matter. *See FCC Nat'l. Bank v. Dobbins,* 151 B.R. 509, 511 (W.D.Mo.1992); *In re Shaw,* 114 B.R. 291, 293–94 (Bankr.D.Utah 1990); *In re Rhodes,* 93 B.R. 622, 624 (Bankr.S.D.Ill. 1988).

The affirmative defense of substantial justification found in § 523(d) was patterned after the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)

---

**37.** The only reported decision where an award of attorney's fees pursuant to § 523(d) was sought after an unsuccessful attempt to declare a debt nondischargeable under § 523(a)(2)(A) and § 523(a)(2)(A) in a chapter 11 proceeding is *In re Sheridan,* 105 F.3d 1164 (7th Cir.1997). It does not appear the applicability of § 523(d) in a chapter 11 proceeding was ever raised as an issue. The plea for attorney's fees was denied because the indebtedness sought to be discharged was found to be a commercial rather than a consumer debt. *Id.* at 1167. The court there also found the debtor could not rely upon a provision of Florida law, which permitted the reciprocal enforcement of a contractual provisions permitting an award of attorney's fees, holding that § 523(d) was the sole instance in the Bankruptcy Code permitting recovery of attorney's fees in an unsuccessful nondischargeability action. *Id.*

("EAJA"), and courts, therefore, often look to cases interpreting the similar language found there.[38] *Citizens Nat'l. Bank v. Randall Clark Burns (In re Burns),* 894 F.2d 361, 362 n. 2 (10th Cir.1990). In interpreting the term "substantial justification" under the EAJA, the Supreme Court has written:

> We are of the view ... that as between the two commonly used connotations of the word "substantially," the one most naturally conveyed by the phrase before us here is not "justified to a high degree," but rather "justified in substance or in the main"—that is, justified to a degree that could satisfy a reasonable person. That is no different from the "reasonable basis both in law and fact" formulation adopted by the Ninth Circuit and the vast majority of the other Courts of Appeals that have addressed this issue. To be "substantially justified" means, of course, more than merely undeserving of sanctions for frivolousness; that is assuredly not the standard for Government litigation of which a reasonable person would approve.

*Pierce v. Underwood,* 487 U.S. 552, 565–66, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (citations omitted). This definition specifically has been adopted for application in a determination of substantial justification in a § 523(a) context. *In re Shaw,* 114 B.R. at 295. A similar series of criteria have also been applied in a § 523(d) context: "1) a reasonable basis in law for the theory it propounds; 2) a reasonable basis in truth for the facts alleged; and, 3) a reasonable connection between the facts alleged and the legal theory advanced." *Id.* (citing *Brinker v. Guiffrida,* 798 F.2d 661, 667 (3rd Cir.1986). *See Phillips v. Napier (In re Napier),* 205 B.R. 900, 908

(Bankr.N.D.Ill.1997). A determination of substantial justification should be determined by an analysis of the totality of the circumstances. *AT & T Universal Card Services Corp. v. Williams (In re Williams),* 224 B.R. 523, 530 (2nd Cir. BAP 1998).

■■■■ The case law construing the term "special circumstances" has been sparse. In the context of the EAJA, courts have suggested this exception should be interpreted in accordance with equitable principles. *In re Hingson,* 954 F.2d 428, 429–30 (7th Cir.1992); *Oguachuba v. INS,* 706 F.2d 93, 98–99 (2nd Cir. 1983) Other courts have suggested that special circumstances exist where: (1) the creditor has advanced a novel legal theory; or (ii) the debtor has unclean hands. *In re Woods,* 69 B.R. 999, 1004 (Bankr.E.D.Pa. 1987). While the court may apply equitable principles to an application for attorney's fees, in a § 523(d) context these equitable principles must be tempered by the stated goal of deferring creditors from filing for unwarranted exceptions to discharge. *Carthage Bank v. Kirkland,* 121 B.R. 496, 500 (S.D.Miss.1990). Further, the authorization to deny an award of attorney's fees based on a finding of special circumstances may not be viewed "as a license to the bankruptcy judge to base decision on idiosyncratic notions of equity, fair dealing, or ... family justice." *In re Hingson,* 954 F.2d at 429.

■■■ It does not appear any special circumstances exist here to block an award of attorney's fees pursuant to § 523(d). The plaintiffs assert that the invocation of the Fifth Amendment privilege by Dr. Grant constitutes a special circumstance under

---

38. The relevant language of the Equal Access to Justice Act is as follows:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (1999)

§ 523(d). They also contend "[t]hroughout the prosecution of this action, debtor has concealed information from the plaintiffs and the Court, both legally and illegally" and specifically state Dr. Grant perjured himself in answering most of their interrogatories. Pls.' Reply to Defs.' Post Tr. Mem., p. 40. However, one court considering whether invocation of the Fifth Amendment privilege constitutes "unclean hands" for the purposes of a finding of special circumstances under the EAJA has rejected this argument. In *U.S. v. Eleven Vehicles*, 937 F.Supp. 1143 (E.D.Pa.1996), the government defended against an award of attorney's fees under the EAJA by contending "the claimants' use of their own affidavits to support their summary judgment motions and the subsequent assertions of their Fifth Amendment privileges at depositions and at any trial of the case indicate unclean hands." *Id.* at 1154. Finding this argument to be spurious, the Court reasoned "[w]hile adverse legal consequences may flow from claimant's assertion of their Fifth Amendment privileges in a civil proceeding, such an assertion is not the equivalent of unclean hands." *Id.* See also *Securities and Exch. Comm'n v. Comserv Corp.*, 698 F.Supp. 784, 789 (D.Minn.1988) (holding that head of accounting department of corporation being investigated exercising his Fifth Amendment rights during initial investigation did not constitute special circumstances making award of attorney fees under EAJA inequitable).

While some cases have found that the "unclean hands" of the defendant may bar an award of attorney's fees under the EAJA, the factual circumstances are greatly at variance with the instant matter. In *Oguachuba*, a habeas corpus petitioner who was seeking the fee award had repeatedly violated federal immigration law in many ways hoping to cause a technical error by the INS which would allow him to remain in this country. While the petitioner prevailed on his writ, the court found "he would not have been incarcerated in the first place but for his notorious and repeated violations of the United States immigration law" which caused a finding the petitioner was without unclean hands in "classic equity terms." *Oguachuba*, 706 F.2d at 99. In *Taylor v. United States*, 815 F.2d 249, 254 (3rd Cir.1987), the court denied an award of attorney's fees where the applicant had taken advantage of unlawful government action and then challenged that action in order to avoid imprisonment under a valid manslaughter conviction. Finally, in *United States Dept. of Labor v. Rapid Robert's Inc.*, 130 F.3d 345 (8th Cir.1997), the petitioner unquestionably committed illegal acts, but the Department of Labor imposed some of its penalties under an improperly promulgated regulation. After relieving the petitioner of a portion of the fines, the court denied award of attorney's fees. *Id.*[39] The limitations of the "special circumstances" exception is well illustrated in *In re Hingson*, 954 F.2d 428, 430 (7th Cir.1992). There, a district judge's use of an alternative finding that a mother-in-law's maintenance of a nondischargeability claim founded on fraud against her former son-in-law was justified by her anger over the divorce was found to be erroneous. Relying upon *Oguachuba* and *Taylor*, the *Hingson* court wrote, "[w]e may assume

**39.** Other cases considering whether there had been a showing of special circumstances to prevent an award of attorney's fees are also deviant from the instant matter. In *In re Shaw*, 114 B.R. at 296 an award was denied because the reliance by the creditor on he debtor's sworn testimony at his creditor's meeting constituted a special circumstance, which suggests a possible confusion of the concepts of "substantial justification" and "special circumstance." In *AT&T Universal Card Services Corp. v. McIvor*, No. CIV.A 97-4734, 1997 WL 749425, at *3 (E.D.Pa. Dec. 4, 1997), a bankruptcy court's finding "that the use of the credit card for cash within one month of filing raises special circumstances" was reversed, the district court finding that evidence that was insufficient to establish a presumption of non-dischargeability was insufficient to constitute special circumstances, also suggesting a confusion of the two affirmative defenses under § 523(d).

that if a debtor could somehow be found to have procured the creditor's groundless claim of fraud, the exception for special circumstances would justify the denial of the debtor's application for attorney's fees." *Id.* at 429. *See also Carthage Bank v. Kirkland,* 121 B.R. 496, 499 (S.D.Miss. 1990). While the invocation of the Fifth Amendment privilege by Dr. Grant may be the basis for the making of certain negative inferences and the alleged false answers to discovery may be the basis for sanctions if proven to be perjurious, under the application of traditional principles of equity neither constitutes a basis to find special circumstances exist to prevent an otherwise justified award under § 523(d).

■ It remains, then, to establish whether the Complaint of the plaintiffs was substantially justified under the provisions of § 523(d). Dr. Grant focuses his argument as to a lack of substantial justification by the plaintiffs on an alleged absence of a reasonable connection between the "law and the pleaded and proved facts." Defs.' Post Tr. Mem., p. 26. He believes the Complaint was founded upon a "tortured" reading of the portion of the Lease which restricted use of the Condo to the tenant and his family and that the misrepresentations of marital status were entirely unrelated to the lease agreement. *Id.* Dr. Grant also suggests an improper motive on the part of the plaintiffs in their attempts to introduce certain evidence concerning Hannis, believing such tactics were an effort to "smear" or "embarrass" Dr. Grant. *Id.* at 27. The plaintiffs in reply reassert their belief they provided sufficient evidence to prevail on the merits of this adversary proceeding, and state the substantial justification, of which they bear the burden to show is found in the fact Dr. Grant did make a misrepresentation of his marital status and their evidence of the alleged reliance by Parker upon this fraud.

Many of the cases which have addressed whether a plaintiff has shown a substantial justification under § 523(d) have occurred where nondischargeability of a credit card debt was undertaken and focus on the degree of pretrial investigation undertaken by the creditor. There appears to be no criticism of the extent to which the plaintiffs investigated the circumstances of this matter. Dr. Grant instead appears to suggest the lack of reliance and proximate cause which this Court relied upon in denying the claim of nondischargeability was so apparent that maintenance of the Complaint by the plaintiffs exhibits a lack of substantial justification so as to trigger an award of attorney's fees here. It is doubtless that these items of proof—reliance and proximate cause—are perhaps uniquely within the knowledge of the plaintiff. No investigation needed to be done for the plaintiffs to form a belief as to the adequacy of their evidence in this regard.

The assertion by Dr. Grant that the premise of the Amended Complaint is Section 2.10 of the Lease is misplaced; the Court has given no weight to that provision in reaching its decision to dismiss the Complaint. While obviously the Court does not agree with the plaintiffs that their evidence shows the existence of justifiable reliance by Parker and the Condo Owners on the misrepresentation of Dr. Grant's marital status, and found there was no proximate cause linking the damage alleged and the misrepresentation here, the Complaint nonetheless raised legitimate issues for consideration by the court in this regard and the positions taken by the plaintiffs cannot be labeled as substantially unjustified. The fact that Dr. Grant did make a misrepresentation with the intent to deceive as to his marital status is clear from the record here. As Judge Mitchell of this court has written in the matter of *Mester v. Brevard,* 200 B.R. 836 (Bankr. E.D.Va.1996) in denying reimbursement of costs and fees pursuant to § 523(d):

> [I]t is undisputed that the listing of monthly payments on the rental application was incomplete. Given the magnitude of the omissions ... [the creditor] had substantial justification for seeking a determination of nondischargeability.

Nothing in the record even remotely suggests that [the creditor] pursued his action knowing he had no case or a weak case but hoping that the debtors would settle rather than incur the expense of defending the action.

*Id.* at 847 n. 11. *See also Citizens Nat'l. Bank v. Burns,* 77 B.R. 822, 823 (D.Colo. 1987) (holding that a misrepresentation had been made and that "[t]he bank was justified in replying upon this fact and the distinct possibility the court would be prepared to infer a scheme from the evidence before it consistent with an intent to deceive on the part of the debtor"), *aff'd,* 894 F.2d 361 (10th Cir.1990). After reviewing the totality of the circumstances here, the Court finds the Complaint of the plaintiffs substantially justified and the request for an award of judgment for costs and attorney's fees by Dr. Grant is denied.

### CONCLUSION

Therefore, while the court finds that Dr. Grant made a misrepresentation of his marital status with Hannis which he knew was false with the intent to deceive, the plaintiffs have failed to prove by a preponderance of the evidence that they justifiably relied upon the misrepresentation and that the damages they claim were proximately caused by the misrepresentation of Dr. Grant. Accordingly, the Complaint is DISMISSED. The prayer of Dr. Grant for an award of costs and attorneys fees pursuant to 11 U.S.C. § 362(d) is DENIED.

The Clerk shall forward copies of this Memorandum Opinion and Order to Kevin Muhlendorf, Esquire, counsel for the plaintiffs and to Lawrence H. Glanzer, Esquire, counsel for the defendant.